David Daniel RUSHING,
Petitioner–Appellant,

v.

Robert H. BUTLER, Sr., Warden,
Louisiana State Penitentiary,
Respondent–Appellee.

No. 88–3082.

United States Court of Appeals,
Fifth Circuit.

March 30, 1989.

Stephen Patrick Doyle, Minneapolis, Minn., Judith Menadue, New Orleans, La., for petitioner-appellant.

William R. Campbell, Jr., New Orleans, La., for respondent-appellee.

Before REAVLEY, JOHNSON, and DAVIS, Circuit Judges.

JOHNSON, Circuit Judge:

In this capital case, petitioner-appellant David R. Rushing appeals the district court's denial of his petition for habeas corpus relief under 28 U.S.C. § 2254. Because we find that the petitioner's eighth amendment right to be protected from imposition of the death penalty in an arbitrary and capricious manner was violated through the improper introduction of victim impact evidence, we vacate the death sentence and remand.

## I.

Petitioner David R. Rushing was convicted and sentenced to death for the murder of taxi-cab driver Danny Archer.[1] The Louisiana Supreme Court affirmed Rushing's conviction and sentence on direct appeal with two justices dissenting. *State v. Rushing*, 464 So.2d 268 (La.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). After his motion for rehearing was denied, Rushing petitioned for writ of certiorari to the Supreme Court of the United States. The Supreme Court denied certiorari. Thereafter, having exhausted his state habeas corpus remedies, Rushing filed a petition for writ of habeas corpus and a motion for an evidentiary hearing in the United States District Court for the Eastern District of Louisiana. The Federal District Court initially granted a stay of execution. However, it ultimately denied Rushing's request for an evidentiary hearing and rejected his claims for habeas corpus relief. Thereafter, on February 5, 1988, the Federal District Court granted a certificate of probable cause. Rushing now appeals from the Federal District Court's denial of his habeas corpus petition.

## II.

The first issue raised by Rushing is whether the court, the state trial court in Louisiana, erred in allowing evidence which was in the form of victim impact testimony to be introduced at his trial in violation of his eighth amendment rights as articulated by the Supreme Court in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed. 2d 440 (1987). Specifically, Rushing maintains that victim impact testimony introduced during the sentencing phase of his trial regarding the personal characteristics of the victim, Danny Archer, unconstitutionally infected the reasoned decisionmaking process which is required of a jury in a capital case. *See, e.g., Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). In that respect, Rushing contends that the irrelevant victim impact evidence presented to the jury at his trial improperly diverted the jury's attention from evidence relevant to a sentencing determination, and therefore resulted in a sentence which was imposed in violation of his constitutional rights under the eighth amendment. We are constrained to agree.

*Booth v. Maryland*, the vanguard Supreme Court case on victim impact evidence, involved the brutal murder of an elderly couple at their home in West Baltimore, Maryland. John Booth, one of two defendants charged with the murders, was convicted of first-degree murder by a Maryland jury for his part in the homicides. Before the sentencing phase of Booth's trial, the Maryland State Division of Parole and Probation conducted a presentence investigation. Pursuant to a Maryland statute pertaining to presentence investigations in felony cases,[2] the presentence investigation report contained a victim im-

---

1. For a complete recitation of the facts, see *State v. Rushing*, 464 So.2d 268 (La.1985), *cert. denied*, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986).

2. Md.Ann.Code Art. 41, 4–609(c) (1986).

pact statement which essentially described the emotional impact of the murders on the victims' families. Contained in the statement were comments regarding the victims' personal qualities as well as grossly descriptive characterizations of the murders by family members. *Booth v. Maryland*, 107 S.Ct. 2529, 2530–31. As an example, the victim impact statement contained remarks that the victims were "loving parents and grandparents whose family was most important to them" and that the victims were "amazing people who attended the senior citizens' center and made many devout friends." The victim impact statement also contained a statement by one family member that the victims had been "butchered like animals." *Id.* at 2531.

At the sentencing phase of Booth's trial, the prosecutor sought to present the victim impact statement to the jury. In response, Booth's attorney moved to suppress the victim impact statement on the ground that it contained irrelevant and unduly inflammatory information which, if presented to the jury, would violate Booth's eighth amendment rights. When the defense motion to suppress the victim impact statement was denied by the Maryland trial court, Booth's attorney sought to have the prosecutor read the victim impact statement to the jury rather than introduce its contents through live testimony. In that regard, Booth's attorney contended that the testimony of live witnesses would exacerbate the allegedly impermissible inflammatory effect of the information contained in the victim impact statement. The prosecutor acquiesced to Booth's argument and read the victim impact statement to the jury rather than presenting the victim impact statement through live testimony. Thereafter, the jury sentenced Booth to death for first-degree murder. *Id.* at 2532.

On appeal, the Maryland Court of Appeals upheld the validity of Booth's death sentence concluding that the jury's decision had not been influenced by passion, prejudice or other arbitrary factors. *Booth v. State*, 306 Md. 172, 507 A.2d 1098, 1124 (1986). The United States Supreme Court, however, after granting Booth's petition for writ of certiorari, concluded that the

eighth amendment prohibits a capital sentencing jury from considering victim impact evidence. *Booth v. Maryland*, 107 S.Ct. 2529. The *Booth* Court reasoned that the very nature of the information contained in a victim impact statement would, in and of itself, create an impermissible risk that the death penalty would be imposed in an arbitrary fashion. *Id.* at 2534. Further, the Supreme Court noted that it would be practically impossible to provide a capital defendant with a fair opportunity to rebut victim impact evidence without shifting the focus of the jury in its deliberations to the victim rather than the defendant. *Id.* at 2535. Thus, any rebuttal by the defendant of victim impact evidence would further increase the risk that the jury's attention on the ultimate question of life or death would be diverted from the defendant as a "uniquely individual human bein[g]," *id.* at 2533 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)), resulting in the imposition of the death penalty in an arbitrary fashion in violation of eighth amendment guarantees.

Turning to the facts of the instant case, we are persuaded that the introduction of victim impact statement evidence to the jury during the sentencing phase of Rushing's trial violated his eighth amendment rights as did the victim impact statement evidence in Booth's case. In particular, the victim impact statement in the instant case created the constitutionally impermissible risk that the jury sentenced Rushing to death not on the basis of Rushing's individual character and circumstances of his crime, but on the basis of emotionally charged testimony from the victim's family about the victim himself. We must conclude that this circumstance fatally flawed the reasoned decisionmaking process mandated by the Constitution in capital cases. In so concluding, we find especially significant the fact that the victim impact statement was not read to the jury from a bound report, but instead was presented by means of live testimony from witnesses. Moreover, that testimony was accompanied by an inflammatory display of human emo-

tions experienced by those who had suffered a grievous loss. For example, the prosecutor's examination of Ruby Gaspard, Archer's aunt, began as follows:

Q: Do you want a kleenex, Ms. Gaspard?

A: Yes.

Q: Excuse me one moment.

A: Thank you.

Q: Ms. Gaspard, if you can, very briefly, I'd like you to tell the ladies and gentlemen of this jury what Danny meant to you.

Record Vol. V at 19. Ruby Gaspard then proceeded to testify in tears about how much she was troubled by the circumstances surrounding her nephew's death, about how much she missed him, and how every day things reminded her of him. Gaspard also tearfully testified regarding Archer's superb ability as a carpenter, craftsman and musician. When the prosecutor asked Gaspard about the proper penalty for the defendant, Gaspard responded that she believed in taking "an eye for an eye." Record Vol. V at 23. Edna Stiller, Archer's friend and co-worker, testified in a similar fashion. Responding to a prosecutor's question concerning what type of man Archer was, Stiller stressed Archer's fine qualities, testifying that Archer was a "fine person" and "would do anything he could to help anybody anywhere." Record Vol. V at 17. She testified that Archer was a hard working man and indicated further that Archer would have given Rushing money if Rushing had only asked.

It is painfully apparent that this eulogistic articulation of grief orchestrated by the prosecutor through Archer's friends and relatives served one purpose and one purpose only—to provide the jury with emotionally charged and inflammatory evidence of Archer's admirable personal characteristics and the extent of emotional distress suffered by Archer's family and friends.

Our decision that Rushing's sentencing was conducted in a constitutionally impermissible fashion is bolstered by the heightened level of scrutiny which appellate courts apply in capital cases. In this regard, it has been said that death is a "punishment different from all other sanctions," *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 2990–91, 49 L.Ed.2d 944 (1976) (citations omitted), and therefore a capital jury is bound to make an "*individualized* determination" of whether a defendant should be assessed the death penalty based on the "character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983) (emphasis in the original) (citations omitted). Moreover, extraneous factors which are injected into the capital jury's decisionmaking process at the sentencing phase must be carefully scrutinized to ensure that they bear upon the defendant's "personal responsibility and moral guilt." *Booth v. Maryland*, 107 S.Ct. at 2533 (quoting *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 3378, 73 L.Ed. 2d 1140 (1982)). In the instant case, we are persuaded that the admission of emotionally charged, live testimony regarding the victim's character, demeanor and reputation in the community were altogether irrelevant to the question of whether David Rushing should be put to death. Thus, the introduction of the victim impact testimony resulted in a capital sentencing proceeding patently "inconsistent with the reasoned decisionmaking [required] in capital cases," and was therefore violative of Rushing's constitutional rights under the eighth amendment. *Booth v. Maryland*, 107 S.Ct. at 2536. *See Zant v. Stephens*, 103 S.Ct. at 2747. Rushing's death sentence is therefore vacated.

### III.

While the disposition of the victim impact issue dispenses with the necessity of addressing Rushing's other points of asserted error at his sentencing proceeding, this is not true in regard to Rushing's challenges to the propriety of the guilt/innocence phase of his trial which we now address. Initially, Rushing contends that he received ineffective assistance of counsel at the guilt/innocence phase. It is axiomatic that the standard of review for a claim of ineffective assistance of counsel is

governed by the Supreme Court decision of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Precisely, the *Strickland* test is whether 1) counsel's performance was deficient, and, if it was, 2) did the deficient performance prejudice the defense. *Id.* 104 S.Ct. at 2064. We review Rushing's claims accordingly.[3]

■ Rushing first argues that his trial counsel was ineffective by conceding guilt during closing argument. In support of this argument, Rushing cites the following comments made during closing argument by his trial counsel:

> I'm not asking you to go beyond the evidence to seek for reasons to acquit. I'm not asking you to acquit this man, because he's admitted from that stand that he was there. He was there, and he's a principal there.
>
> \*    \*    \*    \*    \*    \*
>
> I'm not saying there's reason to let this man walk out of here. I'm not saying to do that. I wouldn't insult your integrity in any form or fashion in asking you to do that.

Record Vol. IV at 229–31. After reviewing the record, we are not prepared to conclude, as Rushing would have us do, that his trial counsel's performance in making the above referenced and isolated remarks was indicative of deficient representation. Rather, the remarks, when considered in context with the remainder of defense counsel's closing argument, appear to be an accurate reflection of the record in this case, specifically that part referring to Rushing's own testimony. Rushing's argument on this issue fails both prongs of *Strickland.*

■ Rushing next argues that, during the course of his trial, his attorney was ineffective in failing to call Deputy John Cousin to testify on Rushing's behalf. The record, however, reveals that Rushing's trial counsel did, in fact, call Deputy Cousin to testify. Deputy Cousin was a jailer at the St. Tammany Parish Jail where Rushing's co-defendant Jeffrey Fussell was incarcerated. Deputy Cousin had been called by Fussell to his cell while Cousin was working the jail graveyard shift. During the course of Rushing's trial, but outside the presence of the jury, Deputy Cousin testified that his conversation with Fussell that night went as follows:

> "Sarge, could I talk to you?" And I said, "What you want to talk about, man? Why you not sleeping?" And he told me, "My conscience is eating me up." And I said, "What do you mean, your conscience is eating you up?" He said, "I keep thinking about David Rushing." He said, "The poor boy is going to spend the rest of his life in jail for something he didn't do." He said, "He was just with me. He didn't know what I was going to do."

Record Vol. III at 137–38. In responding to the prosecutor's objection to the introduction of the above testimony, the trial court concluded that Deputy Cousin's testimony was hearsay and did not fall within any recognized exception to the rule against hearsay. Rushing, however, contends that had his counsel conducted even the most elementary research, he would have discovered cases with precedential authority for excepting Cousin's testimony from the rule against hearsay. The two cases that Rushing cites in support of this contention both allow for a somewhat relaxed standard of admissibility with respect to statements made against a declarant's penal interest.[4] Both cases, however, also require that the hearsay statement in question be cloaked with sufficient indicia of reliability to be admissible. In the instant

---

**3.** To demonstrate deficient performance on the part of defense counsel under *Strickland,* Rushing must show, at a minimum, that his trial attorney made "errors so serious that [he] was not functioning as the 'counsel' guaranteed [under] the Sixth Amendment." In order to satisfy the "prejudice" prong of *Strickland,* Rushing must show that his trial attorney's "errors were so serious as to deprive [Rushing] of a fair trial [with reliable results]." *Strickland,* 104 S.Ct. at 2064.

**4.** *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

case, the trial court, on the record, entered a finding that Fussell's statement to Deputy Cousin lacked any such indicia of reliability and therefore excluded Cousin's testimony as hearsay not falling within any recognized exception.

Without addressing the propriety of the above ruling by the district court, we are constrained to reject Rushing's ineffective assistance claim. Rushing's trial counsel did attempt to call Deputy Cousin to testify; in fact, counsel elicited the desired testimony from Deputy Cousin outside the presence of the jury. Cousin's testimony was excluded from the jury not because of any deficient conduct on the part of defense counsel, but rather because of the trial court's evidentiary ruling. As a result, we are unable to conclude that defense counsel's performance was deficient; therefore, Rushing's argument in this respect is foreclosed by the first *Strickland* requirement.[5]

■ Rushing cites several other areas in which he maintains that his counsel's performance was deficient. Rushing alleges ineffective assistance of counsel in that his defense counsel permitted the transcript of Rushing's confession to be introduced into evidence in its entirety despite the State's offer to delete references to Rushing's drug use and thoughts of holding up a gas station. Rushing also argues that his counsel should have subpoenaed the individual who purportedly supplied Rushing with the narcotics which he and Fussell allegedly consumed on the night of the murder. Finally, Rushing contends that his counsel erred by not requesting adequate jury admonitions and failed to object during trial to leading questions, inappropriate questions and prosecutorial miscon-

duct. With regard to all these contentions, Rushing does not satisfactorily illustrate how he suffered prejudice under the *Strickland* standard. Thus, even if we were to surmise that defense counsel's performance was, in fact, deficient in the above areas, which is something we are not prepared to do, Rushing's claims of ineffective assistance of counsel must fail under the prejudice prong of the *Strickland* analysis.

■ Rushing also argues that he received ineffective assistance of counsel during jury voir dire. Specifically, Rushing points to the fact that his defense counsel failed to strike two particular jurors: a venireman who happened to be an acquaintance of the victim and a venireman who informed the trial court that he did not wish to serve on the jury. In this regard, Rushing urges that his defense counsel also failed to question other veniremen as to whether they knew the victim. Under *Strickland*, a reviewing court is bound to determine trial counsel's effectiveness in light of the "totality of the evidence before the judge or jury." *Strickland* at 2069. Likewise, *Strickland* instructs that the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* Applying the above criteria to Rushing's contention in this regard, we are constrained to conclude that Rushing cannot satisfy the *Strickland* standard.[6]

■ Finally, Rushing argues that prosecutorial misconduct during the course of his trial rendered the trial fundamentally unfair. In particular, Rushing alleges that

---

5. We note that a claim regarding the exclusion of Deputy Cousin's testimony framed in a context other than a claim of ineffective assistance of counsel is not necessarily foreclosed by this conclusion.

6. Rushing urges that because no trial strategy has been cited to excuse his trial counsel's alleged errors, an evidentiary hearing is warranted. In that respect, "[t]he law in this circuit is clear: to be entitled to a hearing on ineffectiveness, a habeas petitioner must allege facts which, if proved, would overcome the presump-

tions that trial counsel is effective and that trial conduct is the product of reasoned strategy decisions." *Taylor v. Maggio*, 727 F.2d 341, 349 (5th Cir.1984). On the facts alleged by Rushing regarding his ineffective assistance claims, we are unable to conclude that, even if some of the facts alleged were true, the presumption of effective assistance would be overcome. We therefore decline to require an evidentiary hearing on Rushing's claims of ineffective assistance of counsel. *See Baldwin v. Blackburn*, 653 F.2d 942 (5th Cir. Unit A 1981).

the prosecutor engaged in six types of misconduct: 1) the prosecutor made inflammatory statements during closing argument; 2) the prosecutor put the credibility of the prosecutor's office behind his assertions; 3) the prosecutor improperly directed the jury's attention to the death penalty during the guilt/innocence phase; 4) the prosecutor made inflammatory and personal attacks against Rushing and Rushing's counsel; 5) the prosecutor elicited improper victim impact evidence; and 6) the prosecutor asked irrelevant questions of witnesses to inflame the jury's passion and divert their attention from relevant matters. We have reviewed all of these instances of alleged misconduct and conclude that Rushing's arguments are without merit.[7] As the Federal District Court properly noted,

> [F]ederal courts may not, in a habeas corpus proceeding, impose the same standards upon state prosecutors that they apply to federal prosecutors in case on direct appeal. The prosecutor's remarks do not present a claim of constitutional significance unless they were so prejudicial that [petitioner's] state court trial was rendered fundamentally unfair within the meaning of the fourteenth amendment. There is such unfairness only if the prosecutor's remarks evince "either persistent and pronounced misconduct or ... the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." When thus attacked, prosecutorial comments are not considered in isolation, but are evaluated in the context of the entire trial as a whole including the prosecutor's entire closing argument.

*Kirkpatrick v. Blackburn,* 777 F.2d 272, 281 (5th Cir.1985) (citations omitted). Once again, we observe that the record reveals overwhelming evidence of Rushing's guilt. While the prosecutor's conduct may have, at times, been less than desirable, we are unable to disagree with the Federal District Court's finding that the outcome of Rushing's trial was not rendered fundamentally unfair under the Fourteenth

Amendment because of alleged prosecutorial misconduct.

## IV. *CONCLUSION*

Having concluded that the death penalty was imposed in violation of Rushing's eighth amendment rights through the improper introduction of victim impact evidence during the sentencing phase of his trial, we vacate the death sentence. Because we have so concluded, we do not reach Rushing's other claims pertaining to sentencing. Further, we reject Rushing's claims with respect to the guilt or innocence phase of his trial and therefore affirm the Federal District Court's denial of Rushing's petition for habeas corpus relief as to those claims only. Accordingly, we vacate the death sentence and remand this case for further proceedings not inconsistent with this opinion.

VACATED AND REMANDED.

---

7. We note that our disposition of Rushing's prosecutorial misconduct claims is not inconsistent with our conclusion that Rushing's eighth amendment rights were violated by the introduction of victim impact evidence at his sentencing proceeding.