**David Junior BROWN,
Petitioner–Appellee,**

v.

**Gary DIXON, Warden, Central Prison,
Respondent–Appellant.**

**David Junior BROWN,
Petitioner–Appellant,**

v.

**Gary DIXON, Warden, Central Prison,
Respondent–Appellee.**

**Nos. 88–4008, 88–4009.**

United States Court of Appeals,
Fourth Circuit.

Argued April 12, 1989.

Decided Dec. 11, 1989.

Richard N. League, Sp. Deputy Atty. Gen. (Lacy H. Thornburg, Atty. Gen. of North Carolina, Dept. of Justice, Raleigh, N.C., on brief), for respondent-appellant.

Robert Steven Mahler (Marshall Dayan, North Carolina Death Penalty Resource Center, Raleigh, N.C., on brief); Bruce T. Cunningham, Jr. (Pollock, Fullenwider, Cunningham & Patterson, P.A., Southern Pines, N.C., on brief), for petitioner-appellee.

Before ERVIN, Chief Judge, and RUSSELL and CHAPMAN, Circuit Judges.

ERVIN, Chief Judge:

David Junior Brown is a prisoner of the State of North Carolina under two sentences of death for first-degree murder. Brown advanced thirty challenges to his conviction and sentence in his 28 U.S.C. § 2254 petition for a writ of habeas corpus. The district court denied relief from the conviction on seventeen grounds. The court ordered relief from sentence on three claims and left the remaining ten, all bearing on the penalty phase of Brown's bifurcated trial, unaddressed. *Brown v. Rice,* 693 F.Supp. 381 (W.D.N.C.1988). We reverse the portion of the order granting relief from sentence, affirm the portion denying relief from the conviction, and remand to allow the district court to consider the ten unaddressed arguments bearing on the sentence.

I.

A.

A jury of the North Carolina Superior Court for Union County found Brown

guilty of the murders of Shelly Diane Chalflinch and her nine-year-old daughter, Christina. The same jury, after hearing testimony from several additional witnesses, returned sentences of death. The North Carolina Supreme Court found no merit to any of Brown's numerous assignments of error, and affirmed. *State v. Brown*, 306 N.C. 151, 293 S.E.2d 569, *cert. denied*, 459 U.S. 1080, 103 S.Ct. 503, 74 L.Ed.2d 642 (1982).

On July 16, 1984, Judge William H. Helms of the North Carolina Superior Court for Moore County denied Brown's motion for post-conviction relief.[1] The motion asserted, among other things, that the prosecutor had improperly exercised his peremptory challenges to purge the jury of all persons with scruples about imposing a death sentence. The North Carolina and U.S. Supreme Courts declined to review the denial of collateral relief.[2] *State v. Brown*, 316 N.C. 734, 345 S.E.2d 393 (denying Brown's petition for a writ of certiorari and remanding for a hearing on a new execution date), *cert. denied*, 479 U.S. 940, 107 S.Ct. 423, 93 L.Ed.2d 373 (1986).

Brown commenced this action on April 17, 1987. On April 21, the district court stayed Brown's execution, scheduled to occur on May 8, 1987. By an order and decision dated August 15, 1988, the court granted Brown relief from his sentence and denied relief from the conviction. Brown has appealed for relief from his conviction, and North Carolina seeks through its cross-appeal the reinstatement of Brown's death sentences.

### B.

The North Carolina Supreme Court opinion on Brown's direct appeal gives a full account of the Chalflinch murders. We have no reason to recapitulate the lurid details here, though we shall in succeeding passages discuss the facts necessary to place the legal issues in context.

We must, however, describe two pre- and post-trial incidents not before presented in the published opinions. The first is the jury selection process. The second occurred only shortly before the oral argument of this appeal, when, according to affidavits from some of Brown's lawyers, a man approached the lawyers with a story that could bolster Brown's defense that someone else had committed the murders and that may accordingly implicate some of the claims challenging Brown's conviction.

We attend first to the details of jury selection. In the words of the district court, "[d]uring the jury selection in this case, [North Carolina] used the voir dire to determine if prospective jurors had *any* feelings about the death penalty and then excused by peremptory challenge 'all jurors who indicated the slightest uncertainty about the death penalty.'" *Brown*, 693 F.Supp. at 389 (emphasis in original) (quoting *Brown v. North Carolina*, 479 U.S. 940, 944, 107 S.Ct. 423, 426, 93 L.Ed.2d 373, 376 (1986) (Brennan, J., dissenting from denial of certiorari)). The district attorney excused by peremptory challenge all nine veniremen who expressed reservations about the death penalty.[3] The district court's decision reports the State's concession "that none of these nine jurors could have been excused for cause because all ... said they could put their personal feelings aside and apply the law as instructed by the judge." 693 F.Supp. at 390. North Carolina, in its argument to us, suggests that the reservations of two of those excused may have warranted exclusions for cause, but concedes that the remaining sev-

---

1. Following the U.S. Supreme Court's 1982 denial of certiorari, the North Carolina Supreme Court stayed Brown's execution and, on March 29, 1984, ordered appointment of counsel to prepare the motion for appropriate relief.

2. On June 15, 1985, Brown moved before North Carolina Superior Court Judge Freeman to reopen the hearing on his motion for appropriate relief, arguing that Judge Helms had improper *ex parte* contacts with the District Attorney's office. Judge Freeman denied the motion on September 19, 1985.

3. N.C.Gen.Stat. § 15A–1217(a)(2) (1988) grants the State fourteen peremptory challenges for each defendant in a capital case. Brown was the only defendant in his case.

en were not so excludible.[4] We shall, for purposes of this opinion, assume what the record supports, that North Carolina peremptorily challenged all nine solely because of their reservations about the death penalty.

The second incident bears on Brown's argument that the denial of his lawyers' requests to inspect the Chalflinches' Southern Pines, N.C., apartment, where the murders occurred, violated his rights.[5] In affidavits given in March, 1989, two of Brown's lawyers reported their interview of a resident of Pinehurst, N.C., a town about three miles from Southern Pines. The interview followed a January 17, 1989 "chance meeting" of the resident, unnamed in any paper before us, and one of the lawyers. The affidavits summarize the exchanges that occurred at the meeting and a subsequent interview.

The resident is a white, blond-haired man. He was born and raised in Pinehurst, where his parents, wife, and children now live. In August 1980, the man, then residing outside North Carolina, was in Pinehurst visiting his family.[6] At a party thrown by his sister, the man met Diane and Christina Chalflinch, and set up a date with Diane for a night three or four days later. The man arrived at the numbered apartment Diane had said was hers about 7:30 P.M. on the appointed day. No one answered his knocks, and he saw no cars parked by the apartment. Apparently persuaded that Diane had stood him up, the man wrote what he described as a "terse" note recording his presence and her absence, signed it with his full name, and wedged it in the apartment door. He left North Carolina the next morning, and soon after learned that the Chalflinches had been stabbed to death. The man states the murders took place thirty or forty hours after he left the Chalflinch apartment.

---

**4.** North Carolina notes, as did the district court, that four of the seven veniremen not excludible for cause voiced support for the death penalty, while the other three indicated their opposition. Excerpts from the voir dire examination of three of the supporters follow.

Q: Mrs. Griffin, you have been sitting there and thinking about, if you need to, I don't know whether you have or not, do you believe in capital punishment?
A: I have been thinking about it, in most cases, yes sir.
Q: Would it be fair to say—I don't want to put words in your mouth, let me rephrase that, are you apprehensive about your role as you sit there at this time knowing the issues at hand?
A: No sir, I feel I could fairly judge on the issues of the courtroom.

\* \* \* \* \*

Q: Mr. Caudle, as you sit there, as Mrs. Griffin said she had, have you been thinking about whether or not you believe in capital punishment?
A: Yes, sir.
Q: Do you or not?
A: In some cases.
Q: In some cases?
A: No answer.
Q: Would some of those cases involve the offense of murder in the first degree?
A: Yes.

\* \* \* \* \*

Q: [Mrs. Smith] Do you believe in capital punishment in some cases?
A: Yes, sir, I do.
Q: Have you ever believed otherwise?

A: I suppose as—when I was much younger, I probably did. I have given a lot of thought, but I do believe in capital punishment, certain consideration.
Q: If the evidence and the law requires it, your consideration of that, I should put it, if under the evidence and the law it becomes your duty to seriously give consideration to returning with a decision that means the defendant will be sentenced to death, can you seriously and conscientiously do that if the evidence and law so warrants [sic]?
A: Yes, sir.

\* \* \* \* \* \*

Mr. Lowder: The State will excuse with our thanks Mrs. Griffin, Mr. Caudle and Mrs. Smith.

**5.** The North Carolina Supreme Court agreed that the State had denied Brown "fundamental fairness and due process" by prohibiting him from inspecting the apartment, but found the error harmless beyond a reasonable doubt based on the record before it. 306 N.C. at 163–64, 293 S.E.2d at 578–79. The district court refused to vacate Brown's conviction on this claim, concluding that "there is no reasonable probability that defendant's inspection of the crime scene would have changed the outcome of the proceedings." 693 F.Supp. at 387. The court also agreed with the North Carolina Supreme Court that the State's error had been harmless, a standard the court perceived to be different from the *Bagley* inquiry into the probable effect of an inspection. 693 F.Supp. at 387.

**6.** The man was not married in 1980.

As the interview concluded, the man showed the lawyers a photograph of himself with shoulder-length hair, remarking "That's what I looked like back then." The man had never been questioned by any law enforcement officials investigating the murders, and had never before told his story to anyone involved in Brown's case. Brown's lawyers had no inkling of the man's connection to the case before the January meeting, and were unaware of any note such as the man described.

Several witnesses for the State and Brown testified at trial to having seen or heard of a white man with long blond hair jumping from a balcony adjoining the Chalflinches' apartment on the night of the murders.[7] The man's identity and whereabouts after that night remained enigmas at trial. The State did not report finding a note or anything else suggesting the presence of a suspicious visitor to the Chalflinches' apartment.[8] This intriguing tale was not presented to the district court, however, since it was unknown to Brown's lawyers until shortly before they presented oral argument in this court. This information remained largely undeveloped and unsubstantiated when the case was before us, and so we elect not to try to factor it into this decision.

## II.

We turn now to the legal claims, beginning with those challenging the propriety of Brown's conviction.

### A.

Brown's arguments against his conviction fall under two analytical heads. Brown first asserts that both North Carolina and his defense team denied him effective assistance of counsel, the State by refusing him pretrial access to witnesses and the crime scene—conduct that Brown argues also denied him due process—and his lawyers by presenting inconsistent defenses. Brown's second argument is that we should, at a minimum, remand to the district court for an evidentiary hearing on his charges that his prosecutor and the judge who handled his motion for post-conviction relief had improper *ex parte* contacts that could somehow invalidate his conviction.[9]

■ We agree with the district court's disposition of these issues given the state of the facts before it, and will treat them here but briefly. The court concluded that under the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1983), neither the presentation of inconsistent defenses—that Brown either did not commit the mur-

---

**7.** Two policemen testified that Raymond Pate, a maintenance man at the Chalflinches' complex, had reported seeing a long-haired blond white man jump from the Chalflinches' balcony. Brown is a black man. The policemen accorded Pate's story little significance because after viewing the area again, Pate decided the man had leapt from the balcony of the apartment next to the Chalflinches'.

Brown called Pate after hearing the policemen's testimony; Pate reported the same story of a man jumping from the adjacent balcony. Pate was leaving the complex shortly after 11:00 P.M. on August 25, 1980, the night of the murders, when he heard "a bunch of hollering and carrying on" from the section of the complex that included the Chalflinch unit. Pate then heard what "sounded like an awful young girl to be at a party going on like that" saying "leave her alone, leave her alone." A couple of bumping sounds, then silence, followed. Shortly afterward, as Pate was driving out of the complex, he saw the man jump from the balcony.

**8.** Brown argued to the district court that the trial court had violated his due process rights by refusing him a recess to investigate the policemen's testimony, which Brown characterized as "newly discovered information." The district court rejected the argument, referring to the trial court's finding on voir dire examination of the officers that Pate's tale, the information Brown asserted was news to him, was if anything more familiar to Brown than to the State and that the District Attorney had not intentionally hidden anything from Brown. The district court itself observed that in any event, Brown had later called and thoroughly examined Pate about what he saw the night of the murders.

**9.** We understand Brown's argument on this issue to concentrate on the conduct of the District Attorney and officials under his control. Brown has not appealed each adverse conclusion reached by the district court. Among the conclusions not challenged is that the trial court, like the District Attorney, erred harmlessly in refusing to allow Brown's lawyers access to the crime scene.

ders or did so while drunk—nor the State's interference with defense investigation deprived Brown of effective assistance of counsel. See *United States v. Cronic,* 466 U.S. 648, 662, 104 S.Ct. 2039, 2048, 80 L.Ed.2d 657 (1983) ("Only when … circumstances justify a presumption of ineffectiveness can a Sixth Amendment claim be sufficient without inquiry into counsel's actual performance at trial.").

The district court held also that the trial court and the District Attorney had not, by inhibiting Brown's investigation, committed a due process error requiring habeas relief because there was no reasonable probability that the investigation could have turned up anything that would have changed the outcome at trial. 693 F.Supp. at 387 (observing that "[h]ad [Brown's] counsel been allowed to view the crime scene he may have become slightly better informed, but what he would have found there would have been what the North Carolina Supreme Court described as overwhelming evidence of [Brown's] guilt.") (noting, among other damning evidence, bloody handprints, matching Brown's, on the wall of the apartment) (citation omitted); see *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Valenzuela–Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1981).

We affirm the district court's holding as to defense counsel's election to introduce inconsistent defenses. Filtering from our analysis the "distorting effects of hindsight" and recognizing the "strong pre-sumption that counsel's conduct falls within the wide range of reasonable professional assistance," we agree that the use of inconsistent defenses was objectively reasonable "under prevailing professional norms." *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2064–65; see also *Elledge v. Dugger,* 823 F.2d 1439, 1442–43 (11th Cir. 1987).

Leaving out of the picture the affidavits of Brown's lawyers, and viewing the case solely as it appeared to the district court at the time of its hearing in the summer of 1987, we uphold the district court's conclusions that "there is no reasonable probability that [Brown's] inspection of the crime scene would have changed the outcome of the proceedings …," 693 F.Supp. at 387, and that "the [State's] interference was not of a sufficient magnitude to give rise to the presumption that the adversarial process broke down," *id.* at 398.[10]

■ Our adoption of the district court's reasoning on the significance of the *ex parte* communication between Judge Helms and Assistant District Attorney James Webb concludes our review of the issues bearing on Brown's conviction.[11] The court found real impropriety in a letter from Webb to Judge Helms suggesting two or three points that the judge might profitably include in his proposed order denying Brown's motion for post-conviction relief.[12] Based on a perusal of the substance of the *ex parte* communication and its effect on Judge Helms's impartiality—

---

**10.** Should the issue arise in proceedings on the new evidence, we note that North Carolina waived the exhaustion requirement before the district court in the interest of expedition. 693 F.Supp. at 385; see *Sweezy v. Garrison,* 694 F.2d 331 (4th Cir.1982).

**11.** The district court labeled this the "threshold" issue in its decision because Brown's success on it alone could prompt only a remand for a second State post-conviction relief proceeding rather than, like success on the other claims, the issuance of a writ ordering retrial or resentencing.

**12.** We, like the district court, grant a presumption of correctness to the findings of fact Judge Freeman made following the hearing on Brown's motion to reopen the proceeding for appropriate relief. See 28 U.S.C. § 2254(d). Webb had reviewed the proposed order after his administrative assistant, Pam Carriker, typed it at Judge Helms's request. Webb did not know personally of any conversations between Carriker and Judge Helms. Webb's suggestion was that Judge Helms include findings on four issues not addressed in the proposed order. There is no indication that Webb suggested what these findings should be.

The district court found an appearance of impropriety, but nothing of constitutional significance, in Judge Helms's use of Webb's staff and incorporation of Webb's suggestions in the final order; the impropriety arose from the judge's failure to notify defense counsel of his course. See *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); N.C.Code of Judicial Conduct, Canon 3A(4).

the latter study informed by Judge Freeman's findings, the transcript of the hearing before Judge Helms, and a comparison of the proposed and final versions of Judge Helms's order—the district court decided that Brown "received a fair consideration of his claims and all the process that he was due ... the *ex parte* communications were innocuous and the nondisclosure harmless beyond a reasonable doubt." 693 F.Supp. at 386; see *Rushen*, 464 U.S. at 120–21, 104 S.Ct. at 456–57 (citation omitted). While we, like the district court, discourage the sort of obviously provocative intercourse at issue here, we find nothing to indicate a proceeding wrongly swayed in the State's favor.

For these reasons, the decision of the district court denying relief from Brown's convictions is affirmed.

### B.

We turn now to the arguments against Brown's sentence, two of which persuaded the district court to grant relief. The court held that the district attorney had illegitimately exercised his peremptory challenges to produce a jury inclined toward the death penalty, and that Brown's lawyer had, by virtue of statements he included in his closing argument, given ineffective assistance. We disagree with the views of the law that underlie both holdings, and reverse.

### 1.

■ The district court agreed with Brown that North Carolina had violated his Sixth and Fourteenth Amendment rights to a fair trial by a panel of impartial jurors. The court synthesized *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20

L.Ed.2d 776 (1967), and *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1987), to hold "that it is unconstitutional for prosecutors to use peremptory challenges consistently to exclude potential jurors who express reservations about capital punishment so as to produce a jury that is uncommonly willing to condemn a man to death." 693 F.Supp. at 393. While we need not declare that *Batson*, the only case currently recognizing a federal constitutional basis to contest the exercise of peremptory challenges, is *sui generis*, much less are we willing to hold that *Batson* opens the door to the restriction on the prosecutor's historical prerogative that the district court would add to the law.[13]

The particular significance of *Batson* was its application in the context of the petit jury of the settled principles for assessing purposeful racial discrimination in the selection of the venire, principles the Court employed to hold that a criminal defendant could establish "a prima facie case of purposeful [racial] discrimination [in the selection of the petit jury] ... solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." 476 U.S. at 96, 106 S.Ct. at 1722. The holding removed the "crippling burden of proof" defendants had borne under *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), which many courts had interpreted to require proof of repeated racial exclusions in connection with a number of cases. 476 U.S. at 92, 106 S.Ct. at 1720.

*Batson* did not purport to introduce to the law its lodestar, that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded". *Id.* at 85, 106

---

**13.** In a dictum to its opinion in *State v. Robbins*, 319 N.C. 465, 356 S.E.2d 279, 296–97 (1987), the North Carolina Supreme Court suggested its agreement with Justice O'Connor's statements that "Batson does not touch, indeed, it clearly reaffirms ... the ordinary rule that a prosecutor may exercise his peremptory strikes for any reason at all" and that a prosecutor may "take into account the concerns expressed about capital punishment by prospective jurors, or any other factor, in exercising peremptory challenges...." *Brown v. North Carolina*, 479 U.S.

at 941, 107 S.Ct. at 424, 93 L.Ed.2d at 374 (O'Connor, J., concurring in denial of certiorari). Faced with the issue squarely in *State v. Allen*, 323 N.C. 208, 372 S.E.2d 855, 863 (1988), the court held that "it was not error under the Constitution of the United States [or the Constitution of North Carolina] for the prosecution to use its peremptory challenges to excuse veniremen who had qualms about the death penalty but were not excludable pursuant to *Witherspoon*."

S.Ct. at 1716. This rule had been plain since *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880). Nor, critically for our decision today, did the Court intimate that *Batson* expanded that century-old rule. Indeed, *Batson* emphasized that "a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried" and that the *Strauder* intrusion on that entitlement was the only one at issue in *Batson*. 476 U.S. at 89, 106 S.Ct. at 1719 (quoting *United States v. Robinson*, 421 F.Supp. 467, 473 (D.Conn.1976), *mandamus granted sub nom. United States v. Newman*, 549 F.2d 240 (2d Cir.1977)).

The district court, however, read *Batson* to signify the broad proposition that "[w]here a constitutional right comes into conflict with the statutory right of peremptory challenges the constitutional right prevails." 693 F.Supp. at 393 (citing *Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 2053–55, 95 L.Ed.2d 622 (1987); see also *Brown*, 479 U.S. at 945, 107 S.Ct. at 427, 93 L.Ed.2d at 377 (Brennan, J., dissenting from denial of certiorari) ("The State ... misses the wider significance of Batson: that the broad discretion afforded prosecutors in the exercise of peremptory challenges may not be abused to accomplish *any* unconstitutional end."). Mating this conclusion with its earlier interpretation of *Witherspoon* that a state intrudes on a defendant's Sixth Amendment rights when, whether by peremptory challenge or a challenge for cause, it culls a jury of anyone with qualms about the death penalty, the court arrived at the holding we have previously described.

We have nothing but respect for the district court's willingness to safeguard the rights of criminal defendants, and particularly of those facing a death sentence. We disagree, however, that the Sixth and Fourteenth Amendments contain the right it would extend to Brown, and therefore hold that a state may use its peremptory challenges to purge a jury of veniremen not excludible for cause under *Witherspoon*.

Our reading of *Batson* alone compels our holding, for we believe the case does not suggest, and may not even authorize, the principle that courts must scrutinize every peremptory challenge to insure that it does not tread on any right of the defendant.[14] *Batson* states in so many words that it views the peremptory challenge as, in all but one instance, truly peremptory. 476 U.S. at 89, 106 S.Ct. at 1719; see also BLACK'S LAW DICTIONARY 1023 (5th ed. 1979) (defining the peremptory challenge as "[t]he right to challenge a juror without assigning a reason for the challenge."). The constitutional bases for the *Batson* holding provide Brown no ready lever to attack the composition of his sentencing jury, for the Court expressly eschewed any Sixth Amendment analysis in arriving at its holding, and the equal protection principles informing its decision have no application to Brown's case. 476 U.S. at 84–85 n. 4, 106 S.Ct. at 1716–17 n. 4. We are unwilling to make the momentous conceptual leap Brown urges on us, a leap that would mean the practical elimination of the peremptory challenge as such. Neither *Batson* nor any other binding or instructive precedent supplies a writ for the conversion of every peremptory challenge to a challenge subject to judicial ap-

---

**14.** We do not mean to intimate a cavalier attitude toward defendants' rights, but rather our sense that, to the extent any sort of balancing test applies in the area outside the ambit of *Batson*, the balance has long ago been struck. The peremptory challenge is "one means of assuring the selection of a qualified and unbiased jury." *Batson*, 476 U.S. at 91, 106 S.Ct. at 1720 (citing *Swain*, 380 U.S. at 221–22, 85 S.Ct. at 836–37). The challenge has deep historical roots, and the Court has noted the "long and widely held belief that peremptory challenge is a necessary part of trial by jury." *Swain*, 380 U.S. at 219, 85 S.Ct. at 835.

While we assume that prosecutors and defense counsel may advance peremptory challenges for reasons that disparage the goals of other sorts of governmental endeavor, we also assume that the goal of jury impartiality may well require such choices. In any event, neither the U.S. Supreme Court nor any other tribunal, and no state legislature of which we are aware, has declared that the peremptory challenge is so serious a threat to other exalted principles that it cannot persist.

proval, and we have no confidence that such a conversion would better protect the principles our system of justice seeks to advance than does the current, and historic, arrangement.[15]

## 2.

 The district court identified an independent basis for the vacation of Brown's

sentence in the ineffective assistance Brown's lawyer gave during the penalty phase. The court found the lawyer, James E. Griffin, to have conceded to the jury both Brown's guilt of the murders and the existence of two aggravating circumstances.[16] Griffin took each step without consulting Brown and despite Brown's continuing protestations of innocence.

**15.** As we have said, *Batson* simply does not address whether the use of peremptory challenge is subject to Sixth Amendment analysis. Even if we were to grant or assume that *Batson* allows judicial scrutiny of peremptory challenges to rectify any possible Sixth Amendment problem, we cannot conclude that the district attorney's excusal of every venireman with scruples about the death penalty created such a problem. The district court saw it as a simple step from the *Witherspoon* holding that Illinois could not, consistent with the Sixth Amendment, carry out a death sentence imposed by a jury purged through challenges for cause of every venireman with any sort of scruple about capital punishment, to its conclusion that North Carolina could not enforce a death sentence rendered by a jury from which the prosecution had excluded scrupled veniremen by peremptory challenge. We do not see the step as simple, or indeed as consistent with *Witherspoon* and other pertinent precedent.

While we will grant that certain passages in *Witherspoon* might, read in isolation, seem to signify a broad holding prohibiting state production, by whatever device, of "a jury uncommonly willing to condemn a man to die," 391 U.S. at 521, 88 S.Ct. at 1776, we must refer to the holding as the best emblem of the law. The *Witherspoon* holding is "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen *for cause* simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777 (emphasis added). The Court clearly considered it significant that "the State of Illinois ... authorized the prosecution to exclude ... all who indicated that they had conscientious scruples against inflicting [capital punishment]." *Id.* at 514, 88 S.Ct. at 1772; see *Lockhart v. McCree*, 476 U.S. 162, 179, 106 S.Ct. 1758, 1768, 90 L.Ed.2d 137 (1986) (identifying *Witherspoon's* subject as "the [deliberately slanted] Illinois system"); *Adams v. Texas*, 448 U.S. 38, 53, 100 S.Ct. 2521, 2530, 65 L.Ed.2d 581 (1980) (describing the *Witherspoon* rationale as that "[t]he State ... [has] no valid interest in such a broad-based rule of exclusion, since '[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him ... and can thus obey the oath he takes as a juror.' [*Witherspoon*, 391 U.S. at 519, 88 S.Ct. at 1775].". While the Court

had no occasion to consider the implications had the prosecution used the peremptory challenge to achieve its end, neither did the Court suggest that such action had the constitutional status of a statute allowing the prosecution in every case to strike as many veniremen—at least thirty-nine in *Witherspoon*—as had qualms about the death penalty.

We cannot conclude that *Witherspoon's* holding that a state may not categorically exclude veniremen who may, despite their scruples, be able to vote a death penalty signifies that a prosecutor cannot, through the exercise of a limited number of peremptory challenges, exclude some or all such veniremen in a particular case. See *Gray*, 481 U.S. at 671–72, 107 S.Ct. at 2058 (Powell, J., concurring) ("This Court's precedents do not suggest that the *Witherspoon* line of cases restricts the traditional rights of prosecutors and defense counsel to exercise their peremptory challenges in this manner," and noting that the *Batson* restriction is distinct, and perhaps unique); see also *id.* at 679, 107 S.Ct. at 2062 (Scalia, J., dissenting with Rehnquist, C.J., and White and O'Connor, JJ.) ("Prosecutors can use peremptory challenges for many reasons, some of which might well be constitutionally insufficient to support a legislative exclusion."); *Brown*, 479 U.S. at 941, 107 S.Ct. at 424, 93 L.Ed.2d at 374 (O'Connor, J., concurring in denial of certiorari) ("Permitting prosecutors to take into account the concerns expressed about capital punishment by prospective jurors ... in exercising peremptory challenges simply does not implicate the concerns expressed in Witherspoon."); *Kordenbrock v. Scroggy*, 680 F.Supp. 867, 911–12 (E.D.Ky.1988) ("Clearly, *Batson* is inapplicable to petitioner's [contention that the exclusion by peremptory challenge of jurors who expressed any qualms about capital punishment denied his Sixth, Eighth, and Fourteenth Amendment rights].". Without a principled basis for such a consequential intrusion, we are unwilling to hold that *Witherspoon*, any more than *Batson*, is a command liberally to examine the exercise of the peremptory challenge.

**16.** Griffin, a Union County criminal defense lawyer, came on board on a defense motion for the appointment of counsel following a change of venue from Moore to Union County. Griffin, working with lead trial counsel James R. Van-Camp, was originally brought in to assist with

The court found the concession of guilt, whether or not a wise and reasonable tactic under the circumstances, an abdication of Griffin's ethical and Sixth Amendment duties to advocate Brown's position and to consult with Brown before making important decisions.[17] 693 F.Supp. at 396. The concession of the aggravating circumstances without prior consultation, on the other hand, was to the district court "inexcusable" and not possibly a reasonable trial strategy.[18] Employing the same *Strickland*-based analysis as controlled its treatment of the guilt-phase claims, the court held Griffin's maneuvers clear instances of ineffective assistance. We apply the same legal rubric, but hold contrarily that Griffin's decisions were, under the circumstances, within his prerogative to make without consultation and examples of reasonable advocacy.

We first consider Griffin's concessions of guilt. Our fundamental difference with the district court on this point lies in our conception of the jury's, and hence defense counsel's, function during the penalty phase. Recalling that the same jury sat during both phases of Brown's trial, we conceive of defense counsel as approaching the penalty phase necessarily cognizant that the jury is not, as at the beginning of the guilt phase, disposed in Brown's favor.

Each juror believes beyond a reasonable doubt that Brown stabbed to death and then mutilated the Chalflinches. There can, then, be no "concessions" of guilt in any meaningful sense because, despite what Brown may wish it to believe, the jury, and therefore the law, thinks him guilty. The cases the district court cites, treating unconsented admissions of guilt by counsel during the guilt phase, simply do not apply. Recognizing a verdict of guilty at the penalty phase of Brown's trial was not the sort of *ipso facto* proof of ineffective assistance that conceding guilt would likely have been at the guilt phase. It was simply a sensible concession to the realities of the penalty proceeding in a capital case.

We are left, then, to consider whether Griffin's recognition of the verdict was, under the circumstances, a reasonable trial strategy consistent with the adversarial character of the proceeding. We believe it was. Griffin could not have failed to recognize that Brown was in a hard place before the jury.[19] See *Elledge v. Dugger*, 823 F.2d 1439, 1444 (11th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988) ("A reviewing court ... must be highly deferential in scrutinizing counsel's performance [at a capital sentenc-

jury selection. Griffin attended the ten-day guilt phase of the trial, during or after which the defense team decided that Griffin ought to handle the penalty proceeding.

17. Examples of what the district court believed concessions of guilt are as follows:

"We are talking about what is going to happen to the man who did it, and that's all we're talking about."

"He may have committed a horrible crime *and he did commit two horrible crimes,* but he is still a human being with a soul despite the blackness of the crime that this man has committed." (Emphasis added.)

"We don't know why he did it, and I agree ... [that] if you brought in a psychiatrist I seriously doubt that anyone could go into his mind and tell us why he did it."

The district court's opinion recites these and other passages in which Griffin adverts to or recognizes Brown's guilt. 693 F.Supp. at 395.

18. Under N.C.Gen.Stat. § 15A–2000(b), the sentencing jury in a capital case bases its sentencing recommendation on the relative weight of

aggravating and mitigating circumstances. The jury had submitted to it during the penalty phase two aggravating circumstances, the only two that seem to apply in light of the evidence adduced during the guilt phase. To the first, which asks whether "[t]he capital felony was especially heinous, atrocious, or cruel," Griffin argued "I think you're going to answer that issue 'yes'." To the second, which asks whether "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons," Griffin argued "Once again, I don't think there is any question you're going to answer it 'yes'."

19. The North Carolina Supreme Court observed that "[t]he [trial] record before us reveals two of the most bloodthirsty and brutal crimes which have ever been reviewed by this Court ... [T]his defendant has been convicted of stabbing to death a young mother and her child, with no apparent motive, and extensively mutilating their bodies." 306 N.C. at 186, 293 S.E.2d 569.

ing hearing]; the tendency and temptation to second-guess is high and must be avoided.") (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065). As far as the jury was concerned, Griffin's client was no longer the presumed-innocent Brown of the guilt phase, but the guilty Brown, Brown's own views on the matter notwithstanding. For Griffin to have ignored this cardinal reality would have been to ignore the essence of the adversarial penalty proceeding, in which the only issue is the fate of a guilty defendant.

We think it unlikely, though perhaps not impossible, that the jury seized upon Griffin's remarks about Brown's guilt as proof that the defense had consistently insulted its intelligence by offering evidence of Brown's innocence during the guilt phase, or that the remarks would cause the jury to remove from its consideration all of the guilt-phase testimony favorable to Brown. *Cf.* 693 F.Supp. at 381 ("To the extent that any of the jurors harbored some residual doubt about ... Brown's guilt, their suspicions were dispelled by counsel's closing argument."). We cannot see how the tack the district court would apparently require Griffin to have followed—resting a penalty argument on Brown's professions of innocence—would have insulted the jury any less or convinced it to credit Brown's witnesses any more favorably than it had at

the the guilt phase. See *Rushing v. Butler,* 868 F.2d 800, 805 (5th Cir.1989) (trial counsel not ineffective for remarks made in closing argument at guilt phase that seem concessions of guilt because remarks, in context, accurately reflected the record); *Parks v. Brown,* 840 F.2d 1496, 1509–10 (10th Cir.1987) (holding counsel's decision not to call a succession of character witnesses at a capital sentencing hearing a reasonable tactical decision, and noting that the exposure of defendant's life history may well have prejudiced him further in the eyes of the jury), *rev'd on other grounds en banc,* 860 F.2d 1545 (1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1930, 104 L.Ed.2d 402 (1989). While the jury obviously did not see fit to reward Griffin's candor by treating his client leniently, *Strickland* mandates that we avoid analyzing the reasonableness of Griffin's performance in view of its lack of success. We certainly do not mean to recommend Griffin's course as the ideal, but hold it reasonable and acceptable in light of his Sixth Amendment duty effectively to assist Brown's interest.[20]

Griffin's statements that he thought the jury would find the two aggravating circumstances are also acceptable under the prevailing law, and for similar reasons. It seems more than reasonable, and indeed almost beyond doubt, that the jury would

**20.** While intimating nothing about the Sixth Amendment implications of a contrary conclusion, we also do not believe Griffin behaved unethically in remarking on Brown's guilt. The district court believed Griffin had violated ABA Code of Professional Responsibility Canon 7 (EC 7–24), which proscribes a lawyer's expression of his personal opinion as to an accused's guilt or innocence. 693 F.Supp. at 395. As we have said, we believe Griffin was not expressing a personal opinion, but rather recognizing the guilty verdict, and hence the legal fact of guilt. Had Griffin not kept the verdict and what it suggested the jury might believe about the enormity of Brown's crimes at all times in mind during his penalty argument, Brown would no doubt have claimed ineffective assistance for this reason. We do not mean by our last observation to condemn Brown or his lawyers for doing all they can to improve his situation; we simply want to emphasize the difficult position Griffin occupied, and hence the reasonableness of his decision to proceed as he did. Moreover, we note that Canon 7, Rule 7.1(B)(1) of the

Rules of Professional Conduct of the North Carolina Bar Association, allows a lawyer "[w]here permissible, [to] exercise his professional judgment to waive or fail to assert a right or position of his client...." The Comment to the rule generally consigns technical and legal tactical issues to the lawyer's discretion, with the purposes of the representation and the right to consult on means left to the client. The distinction between the lawyer's and client's realms of discretion comports with our conclusion that Griffin's decision to proceed without consulting Brown was a reasonable tactic to effect Brown's purpose of avoiding the death sentence. *See also* Canon 6, Rule 6, Comment ("The guiding principle is that the lawyer should fulfill reasonable client expectations for information consistent with the duty to act in the client's best interest, and the client's overall requirements as to the character of the representation.... A lawyer has professional discretion too in determining the means by which a matter should be pursued.").

have found the circumstances existed whatever Griffin argued.[21] *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068; *cf. Magill v. Dugger,* 824 F.2d 879, 888–90 (11th Cir. 1987) (a reasonable probability existed that counsels' errors at the guilt and penalty phases, which prevented the jury from considering powerful mitigating evidence, affected the outcome of the sentencing proceeding).

We observe thus not to rest our decision on a harmless error ground but to suggest that, while Griffin might have done better to avoid the subject of aggravation entirely, his statements seem a reasonable device to gain jury support before proceeding to the arguments on mitigating circumstances that were the heart of Griffin's strategy. As we have said, the remarks could not, in light of the verdict, amount to an admission of guilt. Though Griffin must have known the statements could have tremendous consequences for Brown, this knowledge alone does not mean that Griffin had to obtain Brown's consent to remain within ethical and constitutional bounds. See *Parks,* 840 F.2d at 1509–10. Again, though we do not recommend Griffin's arguments as a model, we hold them not to reflect errors so serious as to have deprived Brown of counsel in a Sixth Amendment sense.[22]

### III.

For the foregoing reasons, we affirm the portion of the district court's order denying Brown relief from conviction, reverse the portion of the order granting relief from sentence, and remand for proceedings on the sentencing claims not addressed by the district court in its first visit to the case.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

**21.** Of course, Griffin's remarks in no way obligated the jury to conclude as Griffin thought it would.

**22.** Having decided that Brown's ineffective assistance and peremptory challenge arguments warranted a new sentencing trial, the district court declined to consider Brown's remaining ten arguments against his sentence. We are confident that, should Brown choose to present these claims on remand, the district court will give them proper attention.