PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

No. 10-2

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Richard L. Voorhees, District Judge.
(3:97-cr-00023-RLV-1)

Argued: January 27, 2011

Decided: May 3, 2011

Before NIEMEYER, DAVIS, and KEENAN,
Circuit Judges.

---

Affirmed by published opinion. Judge Davis wrote the majority opinion, in which Judge Niemeyer concurred, and in which Judge Keenan concurred except as to Part III.A.1. Judge Keenan wrote a separate opinion concurring in part and concurring in the judgment.

---

## COUNSEL

**ARGUED:** Mark Evan Olive, Tallahassee, Florida, for Appellant. Jeffrey B. Kahan, UNITED STATES DEPART-

MENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Claire J. Rauscher, Executive Director, Ross H. Richardson, Assistant Federal Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Lanny A. Breuer, Assistant Attorney General, Greg Andres, Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

---

## OPINION

DAVIS, Circuit Judge:

This federal capital case is before us for the fourth time. *See United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) (hereinafter *Barnette I*); *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004), *vacated and remanded*, 546 U.S. 803 (2005) (hereinafter *Barnette II*); *United States v. Barnette*, No. 02-20-CR-97-23-V (4th Cir. filed Sept. 21, 2007). In *Barnette I*, we reviewed the propriety of the convictions of, and the death sentence imposed on, Appellant Aquilia M. Barnette arising from his murder of two victims and related charges. In the initial appeal, we affirmed the convictions but vacated the death sentence and remanded the case for a new sentencing proceeding. 211 F.3d at 826. Upon remand, the district court empanelled a new jury, which recommended, after a fresh sentencing hearing, a sentence of death. In *Barnette II*, the appeal from the second sentencing hearing, we affirmed the sentence and specifically, we rejected Barnette's contention that prosecutors had exercised their peremptory challenges in a racially discriminatory manner to strike African-Americans from the jury venire in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and its progeny. 390 F.3d at 779.

Barnette sought and was granted *certiorari* and the Supreme Court vacated the judgment and remanded the case

to us for reconsideration of Barnette's *Batson* claim in light of the Court's intervening decision in *Miller-El v. Dretke*, 545 U.S. 231 (2005).

Upon the Supreme Court's remand, after the parties filed supplemental briefs in this court, but before any further consideration of Barnette's *Batson* claim by us, on Barnette's motion, we remanded the case to the district court "for consideration of the *Batson* claim in the first instance in light of *Miller-El v. Dretke*, 125 S. Ct. 2317 (2005)." *See* Docket No. 02-20, entry 212.

The district court held a hearing and thereafter issued a memorandum opinion and order on May 19, 2010, finding and concluding that, even in light of the elucidation of *Batson's* principles in *Miller-El*, Barnette had not met his burden of proving that the prosecution engaged in purposeful discrimination when it exercised peremptory strikes against five African-American members of the jury venire during jury selection for the sentencing phase in 2002. Barnette now appeals the district court's order denying relief on his reconsidered *Batson* claim. For the reasons set forth within, we find no merit in Barnette's contentions that the district court committed prejudicial error in the manner in which it conducted the proceedings below or in its findings of fact and legal conclusions on the merits of Barnette's *Batson* claim. Accordingly, for the reasons set forth within, we affirm.

## I.

### A.

The facts underlying the jury's verdict and sentence recommendation on the capital counts of the indictment are set forth fully in our prior opinion; we briefly summarize them here. In 1996, Barnette made his first attempt to kill his ex-girlfriend, Robin Williams, upon learning that she was involved with another man. Barnette went to Williams' apartment in Roa-

noke, Virginia, where he cut the phone lines, poured gasoline onto a window sill, set fire to the gasoline, and threw a Molotov cocktail into the apartment. After waiting to confirm that the apartment was burning, Barnette drove away. Williams and her friend were able to jump from the second story window and escape, although Williams suffered second- and third-degree burns. The police obtained an arrest warrant for Barnette for two counts of attempted murder and two counts of arson/firebombing.

Upon learning that he was wanted by the police, Barnette hid out in Charlotte, North Carolina, with his cousin. He purchased a shotgun. Then, on the night of June 21, 1996, Barnette, armed with the shotgun, walked to the intersection of Billy Graham Parkway and Morris Field Road in Charlotte. When a car approached and stopped, Barnette put his shotgun to the window and ordered the driver out of the vehicle and into the woods adjacent to the road. Barnette then shot and killed the driver, twenty-two-year-old Donald Lee Allen. He took Allen's wallet and drove the vehicle to Roanoke.

Barnette arrived at Williams' mother's house in Roanoke and waited near the house until morning. After seeing Williams and her mother moving around inside the house, Barnette entered the back yard of the house and cut the telephone lines. Barnette then broke into the house; upon seeing Barnette, Williams fled out the front door. Barnette chased her and grabbed her and attempted to drag her to the car. He told Williams that he was going to kill her and that he had one shotgun shell for her and one for himself. When Williams struggled and reached for the gun, Barnette shot her once in her side. She then attempted to run away, but Barnette shot her in the back. She died a short time later. Barnette testified that the reason he did not kill himself after killing Williams was because he panicked after seeing what the shotgun shells did to Williams. He confessed to both murders a few days later. *Id.* at 779-82.

B.

Barnette was convicted by the original jury after a three week trial in January 1998 on eleven charges: (1) interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a) & (b); (2) use of a destructive device, a firebomb, during a crime of violence, in violation of 18 U.S.C. § 924(c)(1); (3) using and carrying fire and explosive materials during a felony, in violation of 18 U.S.C. § 844(h)(1); (4) making a false statement during the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) & 924; (5) making a firearm by sawing off his shotgun without complying with the provisions of the National Firearms Act, in violation of 26 U.S.C. §§ 5821, 5822, 5861(f) & 5871; (6) possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) & 924; (7) commission of a carjacking that results in death, in violation of 18 U.S.C. § 2119(3); (8) using and carrying a firearm during and in relation to a crime of violence, namely a carjacking, in which death occurs, in violation of 18 U.S.C. §§ 924(c)(1) & (i)2(1); (9) transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312; (10) interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b)(1); and (11) using and carrying a firearm during and in relation to a crime of violence, namely interstate domestic violence, in which death occurs, in violation of 18 U.S.C. §§ 924(c)(1) & (i)2(1). On the jury's recommendation, Barnette was sentenced to death on counts seven, eight, and eleven; as to the remaining counts, the district court imposed an aggregate prison term of life.

Barnette appealed his convictions and sentence, and in 2000, this court affirmed the convictions but vacated the death sentence and remanded for resentencing as to the capital counts. *See Barnette I*, 211 F.3d 803. Barnette was resentenced in July 2002 and once again received a death sentence on counts seven, eight, and eleven. *Barnette II*, 390 F.3d at 783. We affirmed the reimposed death sentences. *Id.* at 812. Thereafter, the Supreme Court vacated the judgment and

remanded for consideration in light of *Miller-El v. Dretke*, 545 U.S. 231 (2005).

Upon the Supreme Court's remand, we remanded the case to the district court for reconsideration.

C.

Upon our remand, the district court permitted the parties to file briefs, in which Barnette sought a new sentencing hearing or in the alternative, an evidentiary hearing. *United States v. Barnette*, No. 3:97CR-23, 2010 WL 2085312, *5 (W.D.N.C. May 20, 2010). The government requested that the court hold another *Batson* hearing addressing only the issue of "pretext," the third prong of the *Batson* analysis. *Id.* The government did not oppose Barnette's request that he be allowed to present evidence of purposeful discrimination at a hearing, but it opposed Barnette's motion for discovery. *Id.* The district court ordered the government to submit unredacted copies of all juror questionnaires in its possession for *in camera* review. *Id.* at *6.

These written questionnaires had been filled out by over 400 potential venirepersons about a month prior to jury selection in Barnette's second sentencing hearing. *Id.* at *9. The questionnaire asked 129 questions submitted by both the government and Barnette, ranging from each juror's personal information, including race and gender, education, employment status and history, marital status, and health background, to their specific beliefs and opinions regarding the death penalty. *Id.* Counsel had received copies of the completed questionnaires prior to jury selection, which began on July 15, 2002. *Id.* During jury selection each side had an opportunity to question each prospective juror, a process that took 10 days and concluded when 65 eligible jurors had been selected. *Id.* The next day, the parties appeared before the district court to exercise peremptory strikes. *Id.* Each side was permitted 20

peremptory strikes plus an additional two strikes for the panel of alternate jurors. *Id.*

The clerk would randomly select a group of 12 jurors and the government was permitted to exercise its peremptory strikes against this group, with the clerk replacing those who had been struck with other eligible randomly selected jurors, until the government had accepted 12 jurors. *Id.* The defense then had the opportunity to strike jurors from this pool in the same manner, until a panel of 12 was selected. *Id.* At that point, the panel went back before the government, and the process continued until a mutually agreeable panel of 12 jurors and four alternates were selected. *Id.* Two jurors were struck for cause during this process, reducing the total number of eligible jurors in the pool to 63. *Id.*

In complying with the district court's order to submit unredacted copies of the juror questionnaires in its possession for *in camera* review, the government also provided copies of handwritten notes taken by the prosecutors during voir dire. *Id.* at *6. The district court denied Barnette the opportunity to conduct discovery. Barnette vigorously opposed this refusal, and specifically, he objected to the court's refusal to permit him to examine the government's unredacted jury questionnaires and copies of the handwritten notes made by members of the prosecution team during the jury selection process.

The district court issued an opinion and order on July 13, 2009, in which it ordered a limited hearing to require the government to provide an explanation for the presence of race and gender notations on the cover sheets of the government's copies of the juror questionnaires. The court stated that it would conduct a *Batson*-type hearing, during which only the court would ask questions; the court would not permit Barnette to cross-examine the trial prosecutors. The court also ruled that Barnette could present evidence of purposeful discrimination that was not available to him at the time he

mounted his original *Batson* challenge during and after the voir dire questioning of jurors.

D.

After holding the renewed *Batson* hearing (as described above) on September 21, 2009, the court issued its opinion and order in May 2010. *United States v. Barnette*, No. 3:97CR-23, 2010 WL 2085312 (W.D.N.C. May 20, 2010). At the start of its analysis, the court concluded that its duty upon remand was "to reconsider its opinion with respect to whether Barnette proved purposeful discrimination at his *Batson* hearing in light of the law set forth in *Miller-El*." *Id.* at *7. In light of this determination, the court concluded that it was "free to retain any or all of its prior findings of fact and conclusions of law with respect to Barnette's *Batson* claim that, upon reconsideration, it determines to be unaffected by *Miller-El*." *Id.* The court then determined that it could exercise one of two options in rehearing Barnette's *Batson* claims: either "to hold another *Batson* hearing whereby the Court's previous rulings as to steps one and two of the *Batson* analysis would stand, but Barnette would be permitted to put forth any pretext argument or evidence that he wished, notwithstanding his failure to make those arguments at his original *Batson* hearing," or to limit its reconsideration "to the arguments raised at the [original] *Batson* hearing, and not otherwise waived on appeal, the issues raised on appeal, and any evidence of purposeful discrimination that was not discoverable prior to the jury being sworn." *Id.* at *8-9.

Concluding that it would adopt the second option it had described, the court determined that it would reconsider: (1) Barnette's statistical argument; (2) whether two white jurors, D. Edwards and D. Stanford, were similarly situated to the five struck African-Americans who were the subject of Barnette's *Batson* claim on appeal; and (3) the relevant evidence and arguments presented at the September 21, 2009 hearing. *Id.* at *9.

*Barnette's Statistical Argument*

The court rejected Barnette's statistical argument that discriminatory intent could be inferred from the number of African-Americans the government peremptorily struck relative to their numbers in the eligible jury pool. *Id.* at *10-11. The court began by noting that of the 63 eligible jurors available in the final pool, 16 were African-American, compromising 25% of the final venire. *Id.* at *10. Twelve of the 16 were randomly selected as jurors or alternate jurors during the final selection process. *Id.* Of those 12, two served on the jury and one served as an alternate, with the government striking seven and the defense striking two. *Id.* In selecting the jury itself, the government used a total of 11 of 20 possible strikes, striking six black and five white jurors; then, when picking the alternates, the government exercised both of its peremptory strikes, against a black female and a white female. *Id.* Thus, in total, the government used seven of its 22 strikes to strike 44% of the eligible black venirepersons, but accepted 25% of the eligible black potential jurors. *Id.* The district court noted that the percentage of black jurors that the government accepted reflected the percentage of African-Americans in the eligible jury pool. *Id.* The court also noted that the jury selection process demonstrated that no negative inference could be drawn from the pattern or timing of the government's strikes. *Id.* at *11.

*The Plausibility of the Prosecution's Race-Neutral Reasons*

Despite saying that it would not reconsider its conclusion regarding the validity of the prosecution's race neutral explanations offered at step two of the *Batson* inquiry, *see id.* at *7 n.2, the district court went on to reconsider this issue and once again rejected Barnette's assertion that the government's race neutral reasons were a pretext for discrimination. *Id.* at *12. Instead, the court concluded that the government's "race-neutral explanations for their strikes were justifiable, proba-

ble, and reasonable and had a basis in accepted trial strategy."
*Id.*

The district court began by considering the reasons given
for striking prospective jurors Bryson and R. Sanders, both of
whom had been in the first group of 12 jurors called forward
during voir dire. *Id.* The government had explained that Bry-
son was struck because she noted that her personal view of
the death penalty waivered, that she was not sure if she
favored abolishing the death penalty, and that she was uncer-
tain as to how she felt about the death penalty; and that pro-
spective juror R. Sanders was struck because of her
uncertainty about whether she could be fair in light of her
belief that the death penalty was applied based upon socioeco-
nomic, race, and age factors. *Id.* At the time of voir dire, the
trial court had found that these reasons were race neutral. *Id.*
Similarly, the district court below found that the record sup-
ported both of the government's explanations and that both
were constitutionally permissible. *Id.* at *12-13.

The district court next considered the plausibility of the
government's race neutral reasons for striking prospective
juror Moore. *Id.* at 13. The government had explained that
Moore was struck because she hesitated when asked whether
she could put the government on an equal playing field with
the defendant, and also based on her religious beliefs. *Id.* Dur-
ing jury selection the district court had accepted this reason as
race neutral, based on "Moore's religious bent against the
death penalty or throwing in the question whether she could
apply it in view of those beliefs and her overall demeanor."
*Id.*

On further review, the district court accepted this reason-
ing, noting that "a prosecutor may use a peremptory strike
against a venireman who has reservations about the death
penalty, [. . . ] on the basis of a prospective juror's demeanor,
[. . .] [or against] a prospective juror who has raised doubts
about her ability to be fair." *Id.* (internal citations omitted).

Noting that Barnette did not dispute Moore's hesitation, the court also observed that, while it could not recall Moore's demeanor at the time, one of the reasons it had cited at the time of jury selection for upholding the plausibility of the government's race neutral reasons was Moore's demeanor. *Id.* at \*14. In light of this finding, Moore's responses reflecting her religious beliefs, and her lack of clarity regarding whether she could consider the death penalty as a punishment, the court again found that these reasons were race-neutral and supported by the record. *Id.*

The district court next reviewed its conclusion regarding prospective juror K. Sanders. *Id.* The government explained that it struck K. Sanders because she hesitated before answering questions as to whether she would consider the death penalty and because she was "somewhat uncommunicative" with the government. *Id.* The court at the time found that the government's reasons were race neutral in light of her demeanor and the overall context of her answers. *Id.* at \*15. Noting again that the government may exercise peremptory strikes against prospective jurors who have reservations about the death penalty, and also based on their demeanor, the district court again found that the government's reasons were supported by the record. *Id.* In so concluding, the court reflected that its decision during voir dire was based on "Sanders' demeanor and the overall tenor of her responses." *Id.*

Finally, the district court again reviewed its conclusion that the government's race neutral reasons for striking prospective juror Blakeney were plausible. *Id.* The government explained that it struck Blakeney because "he was hesitant in his answers during voir dire," that "his views on the death penalty were not very strong," and that "he stated during voir dire that he did not want to sentence anyone to death." *Id.* Finding that the government may strike jurors based on their reservations about the death penalty, especially where the juror demonstrates an unwillingness to impose the death penalty, and noting evidence in the transcript to support the government's

characterization of Blakeney, the court again found that these reasons were valid and not pretextual. *Id.* at *16.

*Comparative Juror Analysis*

After reaffirming the plausibility of the government's race-neutral reasons for its use of peremptory strikes, the district court independently considered Barnette's assertion that a comparative juror analysis established intentional discrimination in the prosecution's use of peremptory strikes. *Id.* This claim had been previously rejected by both the district court and this court. *See Barnette II*, 390 F.3d at 796-97 (explaining that Fourth Circuit precedent dictated that "*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excluded and the other is not") (internal citations omitted). However, the district court reconsidered the claim in light of this court's remand and the Supreme Court's opinion in *Miller-El*. *See Barnette*, 2010 WL 2085312 at *9.

Barnette argued that the five struck African-American jurors were similarly situated to two white jurors, Edwards and Stanford, because they gave substantially similar responses about their ability to consider the death penalty, but that the prosecution accepted only Edwards and Stanford as jurors. *Id.* at *16. The district court rejected this claim as to each of the specific comparisons. *Id.*

First, the court found that Moore and K. Sanders were struck based on multiple factors, including their demeanor, which it described as "hesitant" and "uncommunicative." *Id.* The court then noted that the record did not reflect the demeanor of Edwards or Stanford because Barnette failed to make this claim during his *Batson* hearing, and nothing in the record indicated that they were hesitant, uncommunicative, or shared the concerns that Moore and Sanders did. *Id.* Consequently, the court found that Barnette could not show that

either Edwards or Stanford was similarly situated to Moore or Sanders. *Id.*

The court then noted that Barnette could not show that Edwards or Stanford was similarly situated to Blakeney because Blakeney was also struck for multiple reasons. *Id.* at *17. These reasons included "his hesitancy during voir dire, the weakness of his views on the death penalty, and his statement indicating a reluctance to vote for the death penalty." *Id.* The court also found that Blakeney was distinguishable from Edwards and Stanford because of his expressed reluctance to vote for the death penalty, a reluctance that neither Edwards nor Stanford displayed. *Id.* The court noted that the government did not accept any white panelists who expressed doubt about his or her ability to vote for the death penalty, and in fact struck two other white panelists who expressed reluctance similar to Blakeney. *Id.* On the contrary, the court noted, the government did accept a black juror who expressed hesitation regarding his individual responsibility for sentencing someone to death, but who ultimately did not express a concern about doing so as part of a jury. *Id.*

The court then found that neither Edwards nor Stanford was similarly situated to R. Sanders because neither expressed Sanders' belief that the death penalty was unfairly applied. *Id.* at *17-18.

Finally, the court determined that Bryson was struck because she had indicated both on her questionnaire and during voir dire that she was uncertain about whether she supported the death penalty. *Id.* at *18. Consequently, the court determined that Bryson's responses bore no similarity to Edwards'. *Id.* And, while the court acknowledged that Bryson's responses on her questionnaire were similar to Stanford's, it ultimately concluded that Bryson's voir dire answers "revealed an uncertainty with respect to the death penalty not present in Stanford's." *Id.* The court explained that Bryson neglected to check a box on the juror questionnaire in

response to the question that asked, "If you favor the death penalty, do you favor it very strongly, somewhat strongly, not very strongly at all, or other," and then said in voir dire that she had not formed a definite judgment as to the death penalty. *Id.* In contrast, the court said, Stanford checked "not very strongly at all" in response to that question, and indicated during voir dire that her support of the death penalty depended on the circumstances of the particular case. *Id.* at *19. The court concluded that "unlike Edwards and Stanford, Bryson never articulated a reliable or consistent conceptual support for the death penalty, much less expressed a willingness to impose it." *Id.*

*The Prosecution's Race and Gender Notations on the Cover of the Questionnaires*

After addressing Barnette's argument based on comparative juror analysis, the court considered the final issue on its agenda, Barnette's contention that the race and gender notations on the cover sheets of the government's copies of the juror questionnaires constituted evidence of purposeful discrimination. *Id.* at *19-20. This claim had not been previously considered by the court and in fact relied on evidence and arguments presented at the September 21, 2009 hearing. *See id.* at *9.

Barnette urged the court to find that there was no constitutionally permissible reason for the government's race and gender notations on the cover sheets of the questionnaires because the jurors had already provided identical information in the body of the questionnaires. *Id.* at *20. The prosecutors had explained at the hearing that the notations on the cover sheets of the questionnaires were made either by them or one of their interns for identification purposes only, as jury selection continued long after the conclusion of voir dire, and also because they anticipated *Batson* challenges and wanted to be able to quickly identify jurors if such objections arose. *Id.* Barnette responded that noting a juror's race and gender "is

not a plausible, race-neutral basis for a 'quick recall' of that person" and cited *Miller-El*. *Id.* at \*21.

The district court rejected this argument, finding that *Miller-El* did not find the practice of noting the race of jurors, on its own, to show evidence of discriminatory intent. *Id.* Rather, the *Miller-El* Court found the practice problematic only when viewed alongside the district attorney's office's policy of systematically excluding blacks from juries. *Id.* The district court found that here, "[t]he differences between *Miller-El* and Barnette's case are obvious;" namely, in this case, there was "no evidence that the U.S. Attorney's office had a policy to exclude minority jurors." *Id.*

The court also noted that the same information was requested on the juror questionnaire, showing that both parties acknowledged its relevance to the jury selection process. *Id.* at \*22. In addition, the court noted that because the information was contained in the body of the questionnaire, the prosecutors' decision to include the same information on the cover sheet rather than simply return to the body of the questionnaire on each occasion was "a distinction without a difference." *Id.* Instead, the court found that the prosecutors' use of the notations on the cover sheets was "understandable," and, after reviewing the questionnaires *in camera*, found that the explanation was plausible and rejected this claim. *Id.* at \*23.

## II.

In this part of our opinion in this appeal, we craft a framework for analysis. We first reiterate the basic parameters of a *Batson* claim (Part A). We next summarize our understanding of what effect, if any, the Supreme Court's *Miller-El* decision and its progeny likely have on the review of *Batson* claims (Part B). We then examine our precedents as to how remanded *Batson* claims have been handled by us in the past, and we draw useful lessons from those precedents (Part C).

## A.

The steps to demonstrate a *Batson* violation are well-known and long-settled. *Barnette II*, 390 F.3d at 794. First, the defendant must establish a prima facie case of discrimination. *Id.*; *see Johnson v. California*, 545 U.S. 162, 168 (2005) ("First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'")(citation omitted)). He does so by using the following three-part test:

> (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his other selection of the jury pool.

*Barnette II*, 390 F.3d at 794 (quoting *Keel v. French*, 162 F.3d 263, 271 (4th Cir. 1998)).

Once the defendant establishes a prima facie case, the burden shifts to the prosecutor to provide a non-discriminatory reason for the government's use of the peremptory challenge. *Id.*; *Johnson*, 545 U.S. at 168 ("Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.")(citations omitted). Then, once the prosecution has presented a non-discriminatory reason, the district court must determine, "in light of all the evidence with a bearing on it," whether the defendant has proven intentional discrimination. *Miller-El*, 545 U.S. at 252; *Johnson*, 545 U.S. at 168 ("Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'")(alterations in original; citation omitted)). *See also Snyder v. Louisiana*, 552 U.S. 472,

478 (2008) ("In *Miller-El v. Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted."). The parties here do not dispute the basic structure of a proper *Batson* analysis.

B.

Among the most important Supreme Court cases to apply *Batson* in the past twenty-five years was *Miller-El v. Dretke*, 545 U.S. 231 (2005), a federal habeas action challenging a pre-*Batson* death sentence imposed by a Texas jury. In Miller-El's trial for capital murder in 1985, the prosecution exercised peremptory strikes against ten qualified black potential jurors. *Id.* at 236. Miller-El objected to the strikes on the basis of race and requested a new jury, but his request was denied. *Id.* While Miller-El's appeal was pending, the Supreme Court decided *Batson*, and the Texas Court of Criminal Appeals remanded the case to the trial court for a determination as to whether Miller-El could show that the prosecutors' use of peremptory strikes in his case was because of race. *Id.* On remand, the trial court rejected Miller-El's claim, finding no *Batson* violation because the prosecutors' race-neutral reasons for the strikes supported a finding of no purposeful discrimination. *Id.* The appellate court affirmed the decision. *Id.* at 237.

Miller-El then asserted his *Batson* claim before a federal habeas court and was again denied relief. *Id.* After the Fifth Circuit declined to grant a certificate of appealability, the Supreme Court granted *certiorari* and reversed, found that the denial of a certificate of appealability had been erroneous, and ordered the Fifth Circuit to hear the appeal on the merits of the *Batson* claim. *Id.* After considering the appeal on the merits, the Fifth Circuit, applying the deferential standard of review made applicable by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C.A. § 2254(d)(1)

("AEDPA"), affirmed the judgment of the lower court denying relief. *Id.*

The Supreme Court again granted *certiorari* and in 2005, reversed the Fifth Circuit's merits decision. *Id.*

Despite its seminal character, *Miller-El* created no new rule of constitutional law, as we determined in *Golphin v. Branker*, 519 F.3d 168, 186 (4th Cir. 2008), *cert. denied*, 129 S. Ct. 467 (2008). In *Golphin*, we reasoned as follows:

Contrary to Tilmon's belief, *Miller-El II* did not alter Batson claims in any way. *Miller-El II* itself was a case under AEDPA, so the Court, simply following clearly established federal law as AEDPA requires, could not have crafted a new legal standard. Moreover, subsequent to *Miller-El II*, the Court has retained and continued to apply *Batson's* three-step process. *See Rice v. Collins*, 546 U.S. 333, 338-39, 126 S. Ct. 969, 163 L. Ed.2d 824 (2006) (applying three-step Batson framework to claim of racial discrimination during jury selection).

*Id. See also Majid v. Portuondo*, 428 F.3d 112, 125-30 (2d Cir. 2005), *cert. denied sub nom. Majid v. Smith*, 549 U.S. 863 (2006).

That said, there is no doubt that *Miller-El* had one profound effect on this circuit's *Batson* jurisprudence. Prior to *Miller-El*, and indeed in this very case, *see* 390 F.3d at 796-97, we adhered to the rule that comparative juror analysis was not a critical element of a *Batson* claim. *See Barnette II*, 390 F.3d at 796-97 (noting that "*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excluded and the other is not") (quoting *Howard v. Moore*, 131 F.3d 399, 408 (4th Cir. 1997) (en banc); *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997)). However, in *Miller-El*, the Supreme Court explicitly rejected this rule,

holding that proper analysis of a *Batson* claim requires that a court engage in comparative juror analysis:

> More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. *If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson' s third step. Cf. Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (in employment discrimination cases, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive").

545 U.S. at 241 (emphasis added). The Court went on to conclude that the struck black potential jurors bore strong similarities as well as some differences to nonblack jurors who were permitted to serve, and that in light of the strong similarities, the prosecutors' explanations for the strikes could not be accepted. *Id.* at 247. The Court rejected the idea that the trial or appellate court could develop alternative reasons to justify the strikes, finding that a *Batson* challenge must stand on the prosecution's stated reasons. *Id.* at 252 ("If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."). Consequently, it is clear that upon the remand in this case, the district court was required to (and did in fact) engage in a carefully calibrated comparative juror analysis. *See Barnette*, 2010 WL 2085312 at *16-20.

## C.

Procedurally, we have trod the present terrain before. That is to say, when the Supreme Court decided *Batson v. Ken-*

*tucky*, 476 U.S. 79 (1986), we had occasion to remand to the district court two cases that had been pending on direct review before us, *United States v. Garrison*, 849 F.2d 103 (4th Cir. 1988), *cert. denied*, 488 U.S. 996 (1988), and *United States v. Tindle*, 860 F.2d 125 (4th Cir. 1988), *cert. denied*, 490 U.S. 1114 (1989), for further consideration in light of the Supreme Court's *Batson* decision. *See* 849 F.2d at 105; 860 F.2d at 127. In light of our blanket remand to the district court in the case at bar, those cases provided the template for the manner in which the district court proceeded here.

In *Garrison*, upon the remand, the district court conducted a hearing, received affidavits, and heard argument. 849 F.2d at 105. In addition, the district court directed the government to submit the notes the prosecutors made during voir dire for *ex parte* inspection by the court. *Id.* Garrison contended that the court's decision to examine the notes *ex parte* and its refusal to permit his counsel to view them was error. Garrison also contended that by its refusal to permit direct and cross-examination of the lawyers, coupled with the court's *ex parte* examination of the prosecutors' notes, the district court effectively deprived him of a full adversary hearing. *Id.* In our consideration of Garrison's contentions, we found no prejudicial error in the manner in which the district court had proceeded, concluding that Garrison "misconceive[d] the *Batson* inquiry":

> Although a district court could conduct [a full adversarial, evidentiary] hearing if it believed circumstances warranted it, *Batson* does not require this intrusion on the trial proceedings. When, as here, the defendant has made out a prima facie case of a discrimination, *Batson* requires the prosecutor to "articulate a neutral explanation related to the particular case . . . ." 476 U.S. at 98, 106 S.Ct. at 1723. The explanation given by the prosecutor satisfied *Batson's* requirement for neutrality. A prosecutor is justified in striking jurors that he or she perceives to be

inattentive or uninterested. If the trial court believes the prosecutor's explanation, a reviewing court ordinarily should give this credibility finding "great deference." 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21.

*Id.* at 106.

In *Garrison*, we specifically found no prejudicial error in the district court's decision to conduct an *ex parte* examination of the prosecutor's notes. *Id.* In doing so, we recognized that "the important rights guaranteed by *Batson* deserve the full protection of the adversarial process except where compelling reasons requiring secrecy are shown." *Id.* (citing *United States v. Thompson*, 827 F.2d 1254, 1258-59 (9th Cir. 1987)). We found that while *ex parte* examination of evidence by the district court may be necessary on occasion, "the government must make a substantial showing of necessity to justify excluding the defendant from this important stage of the prosecution." *Id.* (citing *Thompson*, 827 F.2d at 1258). We then found that in the instance at hand, the *ex parte* examination of the prosecutor's notes did not warrant reversal or remand for a new hearing, as the notes "neither contradicted nor added anything of substance to the government's explanations offered and debated at length in open court." *Id.* at 107. In fact, we noted that the district court based its decision "on factors of which Garrison was fully aware and which he had been given ample opportunity to rebut." *Id.* Importantly, in reaching this decision, we noted that:

> The circumstances of this case are unlikely to be repeated in current trials. Because an objection based on *Batson* must be raised immediately, rarely will the court need the prosecutor's notes to see if they cast any light on the prosecutor's recollection of the reasons for peremptory strikes. But if the court decides to consider any notes, other documents, or statements pertaining to the prosecutor's explana-

tion, we, like the Seventh Circuit, counsel that a trial court should ordinarily conduct adversary, rather than *ex parte*, proceedings.

*Id.*

Ultimately, we affirmed the district court's order on the merits of the *Batson* claim. 849 F.2d at 106.

*Tindle* was argued before a different three-judge panel of the court on the same day as *Garrison* and involved review of trial proceedings occurring before the same district judge. In *Tindle*, the district court's after-the-fact *Batson* hearing had followed substantially the same procedures as had been followed in *Garrison*. We again found no error in the district court's refusal to conduct a full-blown adversarial evidentiary hearing, noting that "*Batson* does not require a trial within a trial, and purposely left to lower courts the method of conducting inquiries into *Batson*-type claims." *Id.* at 130-31. Citing *Garrison*, we then concluded that the district court's *ex parte* examination of the prosecutor's notes did not warrant reversal:

> In the Tindle case the prosecutors explained most of their reasons for exercising their peremptory challenges in open court, and we find that the district judge did not err in allowing some of the reasons to be supported by the materials submitted *in camera*. Compelling reasons for the use of this procedure were clearly present in this case.

*Id.* at 131. Again, we affirmed the district court's denial of relief under *Batson*.

Notably, in *Tindle*, Judge Murnaghan filed a partial dissent. He concluded that application of the teaching of *Garrison* (which had been decided in advance of *Tindle*) and *Batson*

dictated that the district court had erred both procedurally and substantively.

After briefly stating that he agreed that the district court acted within its discretion in denying Tindle an evidentiary hearing, Judge Murnaghan considered the district court's decision to review the prosecutor's notes in an *ex parte*, *in camera* submission. *Id.* at 132-33. He concluded that the district court acted improperly in denying Tindle access to the notes because the government failed to make a substantial showing of necessity, as we stated was required in *Garrison*. *Id.* at 133. He stated:

> Where *ex parte*, *in camera* submission is indeed necessary for some reason, obviously the excluded party must rely on the judge to give full and fair consideration to the evidence and to relevant legal and factual issues. But in our adversarial system, we ordinarily go to great lengths to ensure that both sides have an equal opportunity to argue all points and all evidence before a judge reaches his decision, and to ensure that such proceedings are open to the public. I see no reason to stray from the usual principles in the present contest. Indeed, I would argue that openness and candor are even more important in a *Batson*-type controversy than in most other situations. Anyone denied access to purportedly exonerating materials cannot help suspecting the worst—the best intentions of government counsel and the district court notwithstanding—it is simply human nature to be suspicious when relevant data is withheld by a decisionmaker.

*Id.* He then specifically noted the district court's conclusion that examination of the prosecutor's notes demonstrated that the government's reasons at the second step of the *Batson* inquiry were not pretextual. *Id.* In such circumstances, he argued, release of the information "would be reassuring to any

who suspected improper conduct by the prosecution and would foster public confidence in the system." *Id.*

On the merits, Judge Murnaghan disagreed with the majority's conclusion that the district court properly dismissed Tindle's *Batson* claim based on the reasonableness of the prosecution's reasons given at step two of the analysis. *Id.* at 134. Specifically, Judge Murnaghan argued that the district court's finding was clearly erroneous as to the reasons provided for two of the challenges, those made to venirepersons Granderson and Johnson. *See id.* Finding the government's reasons "lame," Judge Murnaghan concluded that:

> *Batson* compels me to reach the conclusion that the government has failed to carry its burden of rebutting Tindle's prima facie case with neutral and non-pretextual explanations for the peremptory challenges of potential jurors Granderson and Johnson. If the explanations offered for those strikes are deemed adequate, the burden explicitly assigned to the government by the Supreme Court in *Batson* becomes totally illusory.

*Id.*

Despite the cogency of the dissent in *Tindle*, relied on heavily here by Barnette, we are of course guided in our review in this case by the panel majority in that case and by *Garrison*. What can be said with unquestioned assurance is that in the more than twenty years of experience with the jurisprudence of *Batson* since our decisions in *Garrison* and *Tindle*, *Batson* hearings have invariably been contemporaneous, adversarial proceedings, typically conducted in the midst of, or immediately at the conclusion of, the district court's voir dire process. And indeed, that is true in this case, as our earlier opinions reflect. Looking back over the decades of the lower courts' experience, we have confidence that the district courts in this circuit have adhered to their obligations to scru-

tinize the use of preemptory strikes in the faithful performance of their duty to combat invidious discrimination in jury selection, while at the same time exercising a sensitive discretion in their implementation of the necessary procedural incidents of that task.

III.

With the above principles in mind, we proceed to consider Barnette's assignments of error. We have distilled the issues raised by Barnette into three essential inquiries.

*First*: whether the district court erred or otherwise abused its discretion in the manner in which it conducted the renewed *Batson* hearing after our remand so as to deprive Barnette of fundamental fairness, and specifically by: (1) reviewing the government's annotated copies of juror questionnaires *in camera* and refusing to order their disclosure to Barnette; (2) refusing to provide clean copies of the questionnaires to Barnette; (3) refusing to allow cross-examination of the trial prosecutors; and (4) refusing to provide the prosecutors' "post-it" notes accompanying the jury questionnaires to Barnette.

*Second*: whether the district court clearly erred in finding and concluding that Barnette had failed to demonstrate that the prosecution's facially neutral explanations for the government's strikes of one or more African-American jurors failed to show racial animus violative of *Batson*.

*Third*: whether the district court clearly erred in finding and concluding that Barnette had failed to establish his *Batson* claim through comparative juror analysis.

As to each of Barnette's claims, we hold that the district court committed neither prejudicial error nor (as applicable) an abuse of its discretion which prejudiced Barnette. Accordingly, we affirm the judgment.

A.

Barnette argues that the district court erred in the manner in which it conducted the renewed *Batson* hearing by reviewing the government's annotated copies of juror questionnaires *in camera* and refusing to order their disclosure to him, refusing to provide him with clean copies of the questionnaires, refusing to allow him to cross-examine the prosecutors, and refusing to provide him with the prosecutors' "post-it" notes accompanying the jury questionnaires. To the extent that Barnette sought "discovery," we review the trial court's denial of discovery requests and its limitation of the presentation of evidence in the context of a *Batson* claim for abuse of discretion. *Tindle*, 860 F.2d at 130-31.

Applying these standards, we conclude that reversal of the district court is not warranted.

1.

District courts routinely use written questionnaires in the voir dire process in high profile cases and certainly when the government seeks the death penalty. *See United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007); *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998) (noting that 352 prospective jurors were summoned prior to voir dire to fill out an extensive questionnaire in the capital trial of Timothy McVeigh). Here, about a month prior to jury selection, over 400 potential venirepersons filled out a 28 page questionnaire, comprised of questions submitted by both the government and Barnette. *United States v. Barnette*, No. 3:97CR-23, 2010 WL 2085312, *9 (W.D.N.C. May 20, 2010). This questionnaire asked 129 questions ranging from each juror's personal information, including education, employment status and history, marital status, and health background, to their specific beliefs and opinions regarding the death penalty. *Id.* Both sides received copies of the completed questionnaires prior to the start of jury selection. *Id.*

Upon remand, the district court ordered the government to submit unredacted copies of all juror questionnaires in its possession for *in camera* review. *Id.* at *6. In complying with the district court's order, the government also provided copies of handwritten notes taken by the prosecutors during voir dire. *Id.* at *6. Barnette vigorously objected to the court's refusal to permit him to examine the government's unredacted jury questionnaires as well as the copies of the handwritten notes made during the jury selection process.

Careful analysis of *Garrison* and *Tindle* lead us to conclude that the district court's refusal to provide Barnette with copies of the annotated questionnaires and notes does not warrant reversal. In *Garrison*, we determined that a trial court should ordinarily conduct adversarial, rather than *ex parte*, *Batson* proceedings. 849 F.2d at 107. We determined that "the important rights guaranteed by *Batson* deserve the full protection of the adversarial process except where compelling reasons requiring secrecy are shown." *Id.* (citing *United States v. Thompson*, 827 F.2d 1254, 1258-59 (9th Cir. 1987). Thus, we said that "the government must make a substantial showing of necessity to justify excluding the defendant from this important stage of the prosecution." *Id. See also Tindle*, 860 F.2d at 131-32. We reiterate these views today and repeat that the district court should rarely if ever resort to *in camera*, *ex parte* examination of evidence or conduct such proceedings.

In *Garrison*, we found that the case presented unique circumstances in the early days of the post-*Batson* regime that were unlikely to be repeated, and in such a situation, the *ex parte* examination of the notes was not an abuse of discretion. *Id.* at 107. We noted that the *ex parte* examination of the prosecutor's notes did not warrant reversal or remand for a new hearing where they "neither contradicted nor added anything of substance to the government's explanations offered and debated at length in open court." *Id.* Rather, the district court "based its decision on factors of which Garrison was fully

aware and which he had been given ample opportunity to rebut." *Id.*

In *Tindle*, we reached a similar conclusion, and we held that compelling reasons existed to justify the district court's decision to permit some materials to be submitted *in camera* where the prosecutors explained their reasons for exercising their peremptory challenges in open court. 860 F.2d at 131-32.

Similarly, we find that here, as in *Tindle* and *Garrison*, we are presented with unique circumstances specific to the unusual procedural posture of the case, and that such circumstances are highly unlikely to be repeated. Furthermore, as in *Tindle* and *Garrison*, the trial court conducted a thorough review of the prosecution's hand-written notes on the juror questionnaires *in camera* before concluding that a substantial number contained opinion work product in the form of jury selection strategy and mental impressions of jurors, some of which was unflattering. The court also found that the notes displayed no discriminatory intent on the part of the prosecutors. In light of these unique circumstances, we will not disturb the court's refusal to provide Barnette with the "post-it" notes or annotated copies of the juror questionnaires.

Important to our conclusion here is the plain fact that except for the comparative juror analysis discussed *infra*, the remand proceedings before the district court amounted essentially to a procedural "do-over" from the 2002 sentencing hearing, in which the parties and the district court revisited ground already covered during Barnette's vigorous *Batson* challenge at the time of the 2002 sentencing hearing. Barnette did not request permission from the district court to review the prosecutors' questionnaires or notes at that time and for good reason: the challenges mounted by Barnette were fully aired in open court and the prosecutors were duty bound to

offer their explanations to the court and to the defense in that manner. They did so.*

---

*We respect our good colleague's view that the district court erred in conducting an *in camera* examination of the racial notations on the government's juror questionnaires, as inconsistent with the "compelling reasons" standard announced in *United States v. Garrison*, 849 F.2d 103 (4th Cir. 1988), and *United States v. Tindle*, 860 F.2d 125 (4th Cir. 1988). As we explain in text, however, we conclude that Barnette was not entitled to examine those notations upon the remand of the case because the relevant documents contained opinion work product of the prosecutors, a fact we relied on in *Garrison* that remained unaltered by *Miller-El*.

Fundamentally, Barnette was not entitled to the information contained on the disputed documents, not only on the basis of privilege but also because the reasons for the prosecutors' strikes were fully aired in open court and on the record during voir dire. As we indicate in text, the reasoning of *Garrison* and *Tindle* is highly context-specific and should be read in light of the fact that those cases arose in the wake of *Batson* itself, which required courts and lawyers to "reconstruct" that which never really happened in the first place. In other words, *Batson* changed the law and criminal practice quite dramatically by empowering defendants in criminal cases to require prosecutors to justify on an *ad hoc* basis, in every criminal case, the prosecutor's strike of even a single venireperson of the same race as the defendant. Courts and lawyers simply were not doing that under the regime of *Swain*, and the "reconstruction" tasks *Batson* imposed in cases pending on direct appeal called for genuine innovation. *Garrison* and *Tindle* are exemplars of that innovative spirit. It seems to us they were quite right for their time and circumstances and, as we indicate in section III.A.2. of this opinion, they retain utility today.

Nevertheless, nearly twenty years post-*Batson* (when the 2002 sentencing hearing took place in this case), the law had grown reasonably settled and we are aware of no federal post-*Batson* trial in which a federal appeals court ordered that a prosecutor's notes be turned over to the defense. Indeed, in this case, not only had the parties participated in 2002 in a fully-adversarial *Batson* hearing, but as a result of the *vacatur* of the original death sentence, the parties had actually been through two *Batson* hearings. This procedural history rather dramatically distinguishes the procedural posture of this case from the procedural posture of *Garrison* and *Tindle*.

For all the reasons set forth here and in text, we are unable to conclude that the district court erred in conducting its *in camera* examination of the prosecution's work product.

The circumstances in this case were quite unlike those presented in *Garrison* and *Tindle*. That is, the Supreme Court's 1986 intervening decision in *Batson* had introduced a wholly-new legal regime, insofar as it rejected the nearly impossible evidentiary burden imposed by *Swain v. Alabama*, 380 U.S. 202 (1965), to show a *Sixth Amendment violation* in the prosecution's exclusion of racial minorities from juries, and replaced it, in overruling *Swain*, with the *equal protection analysis* employed by *Batson* itself. *See Batson*, 576 U.S. at 100 n.25 ("To the extent that anything in *Swain v. Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L.Ed.2d 759 (1965), is contrary to the principles we articulate today, that decision is overruled."). In short, the relatively limited evolution of doctrine heralded by *Miller-El*, *see supra* p. 17 (discussing comparative juror analysis) simply does not compare with the revolution in constitutional doctrine that burst on the scene with *Batson*. In sum, on the record here, Barnette was no more entitled to examine the work product of his trial prosecutors during the hearing on remand than he would have been (had he asked to do so) at the initial *Batson* hearing in 2002. The district court did not abuse its discretion in so concluding.

We also reject Barnette's contention that the prosecutors' notations of race and gender on the cover sheets of juror questionnaires demonstrates an obsession with race. The district court rejected this claim, finding that the prosecutors' race neutral reasons for writing the potential jurors' race and gender on the cover sheets were not pretextual, but rather, that the notes in fact would have provided the prosecutors with quick access to information about each juror and also helped them deal with any potential *Batson* challenges.

We see no reason to reject the conclusion of the district court that the prosecutors' race neutral reasons for the race and gender notations on the cover sheets were not a pretext for discrimination. Barnette has failed to present any evidence suggesting that this practice was anything more than a way for the prosecutors to identify jurors. None of the cases he cites

are persuasive of his contention when viewed in light of the specifics of this case. *See Miller-El*, 545 U.S. at 240-266 (holding that the prosecutor's race neutral reasons for exercising peremptory strikes were pretextual where the prosecutors not only marked jurors' races on juror cards, but also struck ten black jurors, at least two of whom were struck for illegitimate reasons; shuffled the jury in a way that signaled discrimination; posed different voir dire questions to black and nonblack panel members; and had a history of following a specific policy of systematically excluding blacks from juries); *Hardcastle v. Horn*, 332 Fed. Appx. 764, 766 (3rd Cir. 2009) (affirming finding of *Batson* violation where the prosecutor used twelve of fourteen peremptory strikes on African Americans; cited pre-*Batson* law for the propositions that race may be a proper consideration in exercising peremptory challenges in certain cases and that the exercise of peremptory strikes results in unconstitutional discrimination only when it is systematic; and coded the race of the only black juror on the panel, as well as the race of each of the venire persons struck by the defense, but did not note the race of the black venire members she struck); *Green v. Lamarque*, 532 F.3d 1028, 1033 (9th Cir. 2009) (finding *Batson* violation based on comparative juror analysis, as well as noting that the prosecutor used peremptory challenges to eliminate all six African-Americans from the seated jury pool and also noted the race of each venire member he struck from the jury pool).

2.

In addition to requesting copies of the juror questionnaires that contained the prosecutors' handwritten notes, Barnette also requested that the district court furnish his counsel with clean copies of the completed juror questionnaires. Counsel for Barnette did not have their copies of the juror questionnaires when the district court conducted the proceedings on remand because defense counsel (unlike the prosecutors) had returned them to the Clerk of Court at the conclusion of jury selection as instructions from the district court had ordered.

The district court indicated upon remand that it had both the court's copies of the questionnaires and it received the government's copies, but it appears that Barnette's copies could not be located by the Clerk.

The record does not disclose whether clean copies of the questionnaires were otherwise available, but in any event, the district court refused Barnette's request that he be provided with clean copies (including redacted copies of the government's copies) of the questionnaires:

> Barnette has pressed the argument that he has been unfairly disadvantaged on remand because he does not have access to copies of the juror questionnaires. However, setting aside the issue of any notes made by prosecutors on their copies of the questionnaires, the only purpose that would be served by granting Barnette access to the juror questionnaires would be to allow him to raise pretext arguments that he could have made at his Batson hearing but did not. Indeed, the only non-work product related basis Barnette cited for wanting copies of the questionnaires was so that he could look for evidence that the Government had used disparate questioning of jurors based on the jurors' race (Doc. 637 12-13), something that he could have raised at his Batson hearing.

*Barnette*, 2010 WL 2085312, *9.

We hold that the district court's refusal to provide the defense with clean copies of the juror questionnaires was clearly an abuse of its considerable discretion in managing the remand proceedings. We are unable to find that the government has made "a substantial showing of necessity to justify excluding the defendant from this important stage" of the proceedings. *See Garrison*, 849 F.2d at 106. Indeed, our precedent dictates that Barnette should have been provided clean copies of the questionnaires upon remand and the district

court's stated reason for refusing to do so, i.e., because Barnette might have pointed to "disparate questioning," which was "something that he could have raised at his [original] *Batson* hearing," does not withstand close scrutiny. This is because "disparate questioning" is part and parcel of a comparative juror analysis, which the district court correctly identified as the gravamen of the Supreme Court's holding in *Miller-El* and the focus of our further remand of the case to the district court after the Supreme Court vacated our judgment in *Barnette II*. Moreover, owing to the rejection of comparative juror analysis in this circuit before *Miller-El*, *see supra* p. 17, it was incumbent on the district court to ensure that Barnette enjoyed the full panoply of tools available with which to fortify any showing he could arising out of that approach to *Batson* challenges, an approach that was not genuinely available to him before *Miller-El* under the law of the circuit.

We find, nevertheless, that the district court's abuse of discretion in refusing to provide clean copies of the juror questionnaires to Barnette was harmless. *See* Federal Rule of Criminal Procedure 52(a)("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). We base this conclusion on four reasons. First, we recognize that Barnette has had copies of the jury questionnaires before, and in fact had them when preparing this same issue before the district court prior to the Supreme Court's remand for reconsideration in light of *Miller-El*. Thus, this is not a case where Barnette has been denied the opportunity to review and examine these documents thoroughly. Second, Barnette's prior examination of these documents led him to raise the very issue on which the Supreme Court's remand was based, comparative juror analysis. Because Barnette raised this issue in his *Batson* challenge prior to the remand, it is now preserved in its entirety for our review in the current posture of the case. Third, while we discourage *in camera* review of documents where the government fails to make a substantial showing of necessity, we have reviewed the ques-

tionnaires in this case, and we are not persuaded that there is any reasonable likelihood that the outcome of the proceedings below might have been different if Barnette had received clean copies of the questionnaires. Finally, and perhaps most importantly, Barnette has not suggested that he would have proceeded differently had he possessed the questionnaires, or how their possession would have altered his approach in the proceedings below. Consequently, we find that the district court's error in withholding clean copies of the questionnaire from Barnette is harmless, and we see no reason to remand the case for further proceedings. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, *United States v. Nobles*, 422 U.S. 225, 230, 95 S. Ct. 2160, 2166, 45 L.Ed.2d 141 (1975), and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.").

3.

In both *Garrison* and *Tindle*, we rejected the defendants' assignments of error pertaining to the district court's *ex parte* inspection of the prosecutors' notes and the lack of a full adversary hearing. *See Garrison*, 849 F.2d at 105; *Tindle*, 860 F.2d at 130-32. In *Garrison*, we rejected the claim that the defendant was entitled to an evidentiary hearing in which prosecutors and defense attorneys would be examined and cross-examined, finding that *Batson* did not require such a hearing. *Id.* at 106. Rather, as we restated in *Tindle*, the decision whether to conduct an evidentiary hearing in such circumstances is "within the sound discretion of the district court." 860 F.2d at 130. In the present case, we are persuaded that the district court did not abuse its discretion in denying Barnette's request for a full evidentiary hearing. The trial judge at the hearing was the same judge who presided over Barnette's sentencing. He had conducted voir dire and jury

selection, and reviewed the juror questionnaires, the voir dire transcript, and the prosecutors' voir dire notes before concluding that he would conduct a limited hearing to allow the government to provide an explanation for the race and gender notations on the cover sheets of the juror questionnaires. Given the district court's familiarity with the case and our holdings in *Garrison* and *Tindle*, we discern no abuse of discretion in its decision.

B.

We next consider the district court's rejection of Barnette's *Batson* claim on the merits. Although the district court concluded that it would not reconsider issues it had resolved prior to remand that were not altered by *Miller-El*, *see Barnette*, 2010 WL 2085312 at *7, the court nevertheless went on to again reject Barnette's assertion that the government's race neutral reasons were a pretext for discrimination. *Id.* at *12. We also have considered this issue before, and we found that the district court did not err in ruling that the government's peremptory challenges were not exercised for racially discriminatory reasons. *See Barnette II*, 390 F.3d at 794-96. To the extent that the law remains unchanged in this area since our prior decision, we will rely on the same reasoning that guided us to that conclusion as we reconsider the district court's resolution of Barnette's claim. We again review for clear error, giving "great deference" to the district court's ruling. *Id.* at 794-95 (citing *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998); *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995)).

We first note, however, one important clarification of the law to emerge since our last opinion in *Barnette II*. Within the last year, in *Thaler v. Haynes*, the Supreme Court directly rejected the Fifth Circuit's conclusion that a judge "must reject a demeanor-based explanation for a peremptory challenge unless the judge personally observed and recalls the

aspect of the prospective juror's demeanor on which the explanation is based." 130 S. Ct. 1171 (2010)(per curiam).

The Fifth Circuit had concluded that respondent Haynes was entitled to a new trial under *Batson* and *Snyder* because the trial judge who ruled on the peremptory challenges was not present in the courtroom when the attorneys questioned the prospective jurors. *Id.* at 1172 (citing *Haynes v. Quarterman*, 561 F.3d 535, 541 (5th Cir. 2009); *Haynes v. Quarterman*, 526 F.3d 189, 202 (5th Cir. 2008)). Applying *Snyder* and *Batson*, the circuit court determined that it should find clear error "when the record reflects that the trial court was not able to verify the aspect of the juror's demeanor upon which the prosecutor based his or her peremptory challenge." *Id.* at 1173 (quoting *Haynes*, 526 F.3d at 199). Consequently, the court held that it could not properly adjudicate the *Batson* challenge based on demeanor because it would have to be "relying solely on a paper record and would thereby contravene *Batson* and its clearly-established 'factual inquiry' requirement." *Id.* (quoting *Haynes*, 561 F.3d at 541).

In *Thaler*, the Supreme Court explicitly rejected the Fifth Circuit's interpretation of *Batson* and *Snyder*, concluding that "neither [*Batson* nor *Snyder*] held that a demeanor-based explanation for a peremptory challenge must be rejected unless the judge personally observed and recalls the relevant aspect of the prospective juror's demeanor." *Id.* at 1174. The Court therefore reversed the decision of the lower court and remanded the case for proceedings consistent with its opinion. *Id.* at 1175.

Here, the district court accepted as reasonable the government's race neutral reasons for using peremptory strikes against prospective jurors Bryson and R. Sanders. The government had explained that Bryson was struck because she noted that her personal view of the death penalty waivered, that she was not sure if she favored abolishing the death penalty, and that she was uncertain as to how she felt about the

death penalty; and that prospective juror R. Sanders was struck because of her uncertainty about whether she could be fair in light of her belief that the death penalty was applied based upon socioeconomic, race, and age factors. *Id.* We find no clear error in the district court's decision to uphold the government's peremptory challenges to these two jurors. As we noted in *Barnette II*, "[u]nder *Brown v. Dixon*, 891 F.2d 490, 497-98, esp. n.15, (4th Cir. 1989), the government may use a peremptory challenge to strike a juror who has reservations about capital punishment [. . . even where] the government's reason does not support a challenge for cause [. . .]." 390 F.3d at 795.

The district court next found reasonable the plausibility of the government's race neutral reasons for striking prospective juror Moore. The government had explained that Moore was struck because she hesitated when asked whether she could put the government on an equal playing field with the defendant, and also based on her religious beliefs. While the district court stated that it could not recall Moore's demeanor at the time of voir dire, it noted that it had cited her demeanor as a reason for upholding the government's use of a peremptory challenge at the time of jury selection. In light of *Thaler*, we are constrained to the view that the district court did not err in relying on its notations regarding Moore's demeanor at jury selection. *See* 130 S. Ct. at 1174. Furthermore, her opposition to the death penalty based on her religious beliefs is a permissible race neutral reason under *Brown*. 891 F.2d at 497-98.

The district court next readopted its conclusion that the government properly exercised a peremptory strike against prospective juror K. Sanders. The government explained that it struck K. Sanders because she hesitated before answering questions as to whether she would consider the death penalty and because she was "somewhat uncommunicative" with the government. In light of *Thaler*, we find no error in the district court's decision. *See also United States v. Grandison*, 885 F.2d 143, 149 (4th Cir. 1989) ("Numerous valid factors may

influence a prosecutor to strike a particular potential juror, including current and past employment, general appearance and demeanor, previous jury service, and the absence or presence of apparent prejudice.") (quoting *United States v. Lane*, 866 F.2d 103, 106 (4th Cir. 1989)).

Finally, the district court reconfirmed its conclusion that the government's race neutral reasons for striking prospective juror Blakeney were plausible. The government explained that it struck Blakeney because "he was hesitant in his answers during voir dire," that "his views on the death penalty were not very strong," and that "he stated during voir dire that he did not want to sentence anyone to death." We again find no clear error in the district court's decision. *See Thaler*, 130 S. Ct. at 1174; *Brown*, 891 F.2d at 497-98.

## C.

We likewise find no error of fact or law or abuse of discretion in the district court's rejection of Barnette's claim based on comparative juror analysis. Barnette contends that the prosecution used peremptory strikes to excuse five jurors based on responses that were fundamentally the same as those provided by two white jurors who were permitted to serve on the jury. We rejected this claim in *Barnette II*, finding that "*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excluded and the other is not." *Id.* at 796 (quoting *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir. 1997)). Since *Miller-El*, however, we are bound to consider Barnette's comparative juror analysis claim on the merits. *See* 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."). In doing so, we determine that the district court did not err in denying Barnette's claim.

Barnette first contends that juror Bryson was improperly struck based on comparative analysis. Bryson is an African-American female. Barnette argues that white jurors Edwards and Stanford were similarly situated to Bryson but permitted to serve on the jury. The prosecution explained it struck Bryson because her personal view on the death penalty waivered, she was not sure if she favored abolishing the death penalty, and she was unsure about how she felt about the death penalty.

The district court found that Edwards displayed nowhere near the level of hesitation regarding the death penalty that Bryson displayed, noting that when asked whether they favored abolishing the death penalty, Bryson answered "Not sure," while Edwards answered "Probably not." J.A. 299, S.J.A. 206, 366. Edwards also said that she favored the death penalty "somewhat strongly," while Bryson declined to answer that question at all. J.A. 299, S.J.A. 207, 367. While Bryson described her attitude towards the death penalty as "uncertain," Edwards replied that she believed that once imposed, the death penalty should be enforced "more promptly." J.A. 299, S.J.A. 207, 376. Finally, while Bryson said her view on the death penalty waivered, Edwards responded that she believed the penalty "should be carried out when the crime warrants it." J.A. 300, S.J.A. 205, 365-66. We find no clear error in the district court's finding that Edwards was not similarly situated to Bryson.

The district court noted that Stanford's responses on her questionnaire were more similar to Bryson's, but found that Stanford's responses during voir dire distinguished her from Bryson. When asked her opinion on the death penalty, Stanford said that she thought it was "probably warranted" in "certain circumstances." J.A. 300, S.J.A. 112. When asked the same question, Bryson said, "I can't really say. . .I can't say I'm really for the death penalty or totally against it. I really haven't formed any serious hard core judgment on that." J.A. 300, S.J.A 81. When pushed, Bryson responded that some-

times she supported the death penalty but sometimes she was against it, and that she was "really unsure" of her feelings. J.A. 300, S.J.A. 90-91. We find no clear error in the district court's determination that these responses distinguish Stanford from Bryson.

The second venireperson Barnette claims is similarly situated to Edwards and Stanford is R. Sanders, an African American woman. The prosecution explained it struck R. Sanders because she expressed uncertainty as to whether she could fairly apply the death penalty in light of her belief that it was unfairly based upon socioeconomic, race, and age factors. R. Sanders wrote on her questionnaire that "the death penalty was applied to certain cases almost automatically" and that she had "strong feelings against the 'fairness' of the death penalty as applied on [an] individual case basis." J.A. 287, S.J.A. 232. We find no clear error in the district court's determination that these beliefs adequately distinguish R. Sanders from both Edwards and Stanford.

The third prospective juror Barnette challenges is Moore, an African-American female. The prosecution explained that it struck Moore because she hesitated a long time in response to the question as to whether she could put the Government on an equal playing field with the defendant. The prosecutor also noted concern over whether her religious beliefs might influence her ability to impose a sentence of death. The district court noted that Moore was struck largely on her demeanor, namely her hesitation, and found that it had no reason to recall the demeanor of either Stanford or Edwards, since Barnette did not raise this claim at the time of the voir dire proceeding, and the record is silent on the subject. Considering this absence of evidence, and in light of *Thaler*, we are not persuaded that the district erred in denying the claim as to potential juror Moore. *See Thaler*, 130 S. Ct. at 1174.

The fourth prospective juror Barnette challenges is K. Sanders, another African American female. The prosecution

explained that it struck K. Sanders because of her hesitancy regarding her ability to impose the death penalty, as well as her long hesitations before answering questions on her opinion of the death penalty and failure to communicate in voir dire. The district court determined that Sanders was not similarly situated to Edwards or Stanford since Sanders was struck largely because of her demeanor. We discern no basis to reject as clearly erroneous the assessment of the district court.

The fifth and final prospective juror Barnette challenges is Blakeney. The prosecution explained it struck Blakeney because he was hesitant in his answers, his views on the death penalty were not very strong, and he said in voir dire that he did not want to sentence anyone to death. When asked his personal view of the death penalty, Blakeney wrote on his questionnaire, "not very strong." J.A. 293, S.J.A. 311. During voir dire he indicated that he had no opinion on the death penalty and had not thought much about the issue. He said that he was not sure he would be comfortable deliberating because he did not want to sentence anyone to the death penalty. Then, he hesitated before clarifying that he thought he could vote for the death penalty despite his desire not to do so. The district court found that Blakeney was distinguishable from Edwards and Stanford because of his expressed reluctance to vote for the death penalty, a reservation not shared by Edwards or Stanford. The district court's determination is not clearly erroneous.

## IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

KEENAN, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the majority opinion, except for section III.A.1. See slip op. at 26-31. In that section, the majority concludes

that the district court did not err in refusing to allow Barnette to review the prosecutors' race and gender notations (the race notations), which the court considered in rejecting Barnette's *Batson* claim. In my view, in reaching its conclusion, the majority fails to apply our holdings in *United States v. Garrison*, 849 F.2d 103 (4th Cir. 1988), and *United States v. Tindle*, 860 F.2d 125 (4th Cir. 1988). However, I agree with the majority's ultimate holding that the district court's judgment should be affirmed, because the record shows that the district court's error in refusing to allow Barnette access to the race notations was harmless beyond a reasonable doubt.

## I.

After the Supreme Court issued its decision in *Miller-El v. Dretke*, 545 U.S. 231 (2005) (*Miller-El II*), and vacated our prior decision affirming Barnette's convictions, see 546 U.S. 803 (2005), vacating *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004), the government filed a supplemental joint appendix in this Court that included the completed questionnaire of an African-American juror, Betty Campbell, who had been excused for cause. On the cover sheet of Ms. Campbell's questionnaire was a notation that included the juror's name, the fact that she had been excused for cause, and the letters "B/F," signifying that this potential juror was a black female. Seeing this "B/F" notation for the first time, Barnette argued that this notation was evidence that the government purposefully discriminated against black jurors during jury selection.

We remanded the case to the district court for "further consideration of the *Batson* claim in the first instance in light of [*Miller-El II*]." On remand, the district court ordered the government to submit for *in camera* review copies of all juror questionnaires in the government's possession. *See United States v. Barnette*, No. 3:97CR-23, 2010 WL 2085312, at *5 (W.D.N.C. May 20, 2010). Upon receiving the government's submission, the district court observed that the race and gender notation on the first page of Ms. Campbell's juror ques-

tionnaire was not an aberration. Rather, the district court found that of the 204 questionnaires submitted by the government for *in camera* review, 117 had a race notation on the cover sheet, 64 of which related to eligible jurors. *Id.* at *20. Although the district court rejected Barnette's request to obtain these unredacted copies of the juror questionnaires containing the 117 race notations, the district court "set a hearing for the Government to explain the presence of race and gender notations on the cover sheets of questionnaires from the *in camera* submission." *Id.* at *6.

The district court conducted a hearing on this issue, at which the district court and the government, but not Barnette, had copies of the 117 juror questionnaires containing the race notations. Barnette's counsel expressed an objection to the non-adversarial, one-sided nature of this hearing, in which the district court and the government engaged in a colloquy concerning information to which Barnette was not privy. Barnette thus was unable to question any of the explanations provided by the government relating to the presence of the race notations.

Following the hearing, the district court issued an order and memorandum opinion in which the court rejected Barnette's *Batson* claim. The district court's opinion revealed to Barnette for the first time that, in addition to the race notations handwritten on 117 of the juror questionnaires, the prosecutors had made race and gender notations on "sticky notes" attached to 48 of the 117 questionnaires that already had a race notation. *Id.* at *20. In its opinion, the district court accepted as "plausible" the government's explanation that the race notations were made to help the government respond to "*Batson* objections." *Id.* at *23. The district court concluded, after reviewing the copies of the juror questionnaires containing the race notations to which Barnette was denied access, that there was no evidence that the prosecutors purposefully excluded any prospective juror based on that person's race. *Id.*

II.

Citing several reasons, the majority approves of the district court's *in camera* examination of the race notations, and the effectively *ex parte* hearing described above. First, the majority states that, "as in *Tindle* and *Garrison*, we are presented with unique circumstances specific to the unusual procedural posture of the case, and that such circumstances are highly unlikely to be repeated." Slip op. at 28. Although I agree that there are unique circumstances presented here that are not likely to be repeated, and that the procedural posture of this case is unusual, these facts do not support the majority's failure to apply the central holdings of *Tindle* and *Garrison*.

In *Garrison*, a case also involving a *Batson* challenge, this Court emphasized that "the important rights guaranteed by *Batson* deserve the full protection of the adversarial process except where *compelling reasons* requiring secrecy are shown." 849 F.2d at 106 (emphasis added). We stated further that "the government must make a *substantial showing of necessity* to justify excluding the defendant from" the district court's *ex parte* examination of the prosecutor's notes. *Id.* at 106 (emphasis added). We cautioned that "if the [district] court decides to consider any notes, other documents, or statements pertaining to the prosecutor's explanation [for striking a minority potential juror], we . . . counsel that a trial court should ordinarily conduct adversary, rather than ex parte, proceedings." *Id.* at 107. Nevertheless, we concluded that any error committed by the district court in that case was harmless, because "[t]he notes neither contradicted or added anything of substance to the government's explanations offered and debated at length in open court." *Id.*

Our decision in *Tindle* again addressed whether a defendant was entitled to the prosecutors' notes concerning the reasons for the exercise of peremptory challenges, which the district court had reviewed *in camera*. In concluding that the district court did not err in refusing the defendant access to those

notes, we observed that the district court found that the *in camera* material "included extremely sensitive matters as well as work product materials of the government attorneys. Portions of the sensitive materials submitted relate to threats and attempted intimidation fostered by defendant Tindle himself." 860 F.2d at 131. We quoted our *Garrison* decision extensively, applied the required "compelling reasons" standard, and concluded that "[c]ompelling reasons" for the use of [the *in camera*] procedure were "clearly present" in that case. *Id.* at 132.

In my view, the majority fails to apply the required "substantial showing of necessity" or "compelling reasons" standard, as mandated by our decisions in *Tindle* and *Garrison*. Instead, the majority sidesteps these requirements, merely concluding that "unique circumstances" are present here. In short, the majority fails to identify any particular "compelling reason" or basis supporting a "substantial showing of necessity" that would justify the district court's *in camera* consideration of the prosecutors' notes.

Most notably, the government conceded during oral argument before this Court that such "compelling reasons" do not exist in this case. In accordance with this concession, I would apply the "substantial showing" of "compelling reasons" standard, as required by *Tindle* and *Garrison*, and would conclude that the government has failed to establish "compelling reasons" to deny Barnette access to the materials analyzed by the district court. My second concern with the majority's analysis is its reliance on the work-product status of the race notations at issue. The fact that these notations were the prosecutors' work product does not play a role in our analysis under *Tindle* and *Garrison*. Rather, the work-product nature of this material is the very reason why *Garrison* and *Tindle* are applicable in the first place, because each of those cases also involved attorney work product in the form of the prosecutors' notes.

Third, in my view, the majority incorrectly relies on the fact that, at the sentencing hearing in 2002, Barnette did not

request permission to review the prosecutors' annotated questionnaires or notes. The majority emphasizes this fact in concluding that the district court did not err in denying Barnette access to this material on remand after the Supreme Court's decision in *Miller-El II*. *See* slip op. at 28-29. In 2002, however, Barnette was unaware that the race notations existed, and he did not become aware that there were such notations until the government's submission to this Court in 2005 following the *Miller-El II* decision. Because neither *Tindle* nor *Garrison* authorizes a "fishing expedition," Barnette should not be faulted for failing in 2002 to seek access to the race notations of which he was not aware.

Fourth and finally, while I appreciate the majority's attempt to place *Garrison* and *Tindle* in historical perspective, *see* slip op. at 27-28, I fail to see how that perspective permits us to depart from the holdings of those cases. There is nothing in the opinions in *Garrison* and *Tindle* that suggests a time limit regarding how many years after the *Batson* decision this Court should continue to apply the "compelling reasons" standard that governs cases of this type. *Cf. Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) ("We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today."). Perhaps, as the majority suggests, the "relatively limited evolution of doctrine heralded by [*Miller-El II*]," slip op. at 30, is reason to revisit the "compelling reasons" standard, but that task would be one for the en banc consideration of this Court, not for this panel.

In sum, I would hold that our opinions in *Garrison* and *Tindle* plainly require that when a district court analyzing a claim under *Batson* decides to consider prosecutors' notes regarding the reasons for the exercise of preemptory strikes, the district court should ordinarily conduct adversarial, rather than *ex parte*, proceedings. *See Garrison*, 849 F.2d at 107. Therefore, I would conclude that although Barnette was not entitled to the race notations in the first instance, he was entitled to view them at the *Batson* hearing on remand once the

district court decided to consider the notations but failed to find a "substantial showing" of "compelling reasons" to exclude Barnette from access to them. Accordingly, I would hold that the district court erred in denying Barnette the opportunity to review the race notations made by the prosecutors.

## III.

Although I would conclude that the district court erred in denying Barnette the opportunity to review the race notations, I would nevertheless hold that the district court's error was harmless beyond a reasonable doubt. I have reviewed the copies of the juror questionnaires that contain these notations, and would conclude, just as this Court concluded in *Garrison*, that "[t]he notes neither contradicted nor added anything of substance to the government's explanations offered and debated at length in open court." 849 F.2d at 107. Both the district court and the panel majority conducted a detailed and thorough comparative juror analysis, in the latter of which I am pleased to concur.

In this case, it is clear beyond a reasonable doubt that even with the benefit of access to the prosecutors' notes, Barnette would not have been able to establish that the prosecutors purposefully excluded any prospective juror based on that person's race. I therefore concur in the judgment reached by the majority.